**Marvinell BROWN, Plaintiff,**

**v.**

**ASD COMPUTING CENTER, et al., Defendants.**

**No. C–3–79–323.**

United States District Court,
S. D. Ohio, W. D.

July 15, 1981.

Marvinell Brown, pro se.

Robert Fogarty, Asst. U. S. Atty., Dayton, Ohio, for defendants.

OPINION CONDITIONALLY SUSTAINING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; FURTHER PROCEDURES ORDERED OF GOVERNMENT COUNSEL BEFORE OPINION DOCKETED AS FINAL JUDGMENT ENTRY

RICE, District Judge.

I. Introduction

This matter is before the Court pursuant to Defendant Hans M. Mark's Motion for Summary Judgment under Fed.R. of Civ. Proc. 56(b). Defendant Mark is the Secretary of the Air Force (hereinafter referred to as the Government), and is the only remaining defendant herein, as ASD Computing Center was dismissed as a party defendant by order of Judge Carl Rubin on May 7, 1980. The Government has submitted two affidavits and several exhibits in support of its motion. Additionally, the depositions of Harold Weigle, Frederick Pitts, and Plaintiff Marvinell Brown (hereinafter Weigle, Pitts, and Plaintiff, or Brown, respectively), have been filed with the Court and have been considered in conjunction with Defendant's motion. Plaintiff filed her memorandum contra Defendant's Motion on November 13, 1980, without supporting affidavits, and on November 14, 1980, the matter came on for an oral hearing before the Court. At that time, Plaintiff, acting as her own counsel pursuant to her request of October 20, 1980 (Doc. 52), was advised upon the record by the Court, that she may submit materials to counter the documents presented by Defendant. Since that time, Plaintiff has filed an unsigned letter (Doc. 56), which was apparently intended as a supplement to those arguments advanced by Plaintiff at the hearing on November 14, 1980. Plaintiff has also filed requests for a hearing on discovery and to amend her complaint (Doc. 58). These matters are not immediately central to the disposition of the Motion for Summary Judgment, but will be briefly addressed later in this opinion.

The Court is well aware of the disadvantages faced by a pro se litigant, and has endeavored to give Plaintiff the benefit of every possible presumption in her favor, despite the fact that the withdrawal of Plaintiff's counsel was granted at Plaintiff's own request. Thus, although Plaintiff has not presented any affidavits to counter the materials submitted by Defendant, the Court has scoured the record for any inferences supporting her claims of discrimination. Despite this conscientious effort, the Court has been unable to find a

scintilla of evidence to support Plaintiff's assertion that she was not afforded equal training opportunities due to her race and sex, or to substantiate the contention that Plaintiff was in any manner the subject of a retaliatory discharge.

Before the specific matters raised by Defendant's Motion for Summary Judgment are addressed, the Court will briefly outline those factual materials which were analyzed in its ruling. First, the affidavits of Weigle and Pitts have been considered, as well as Defendant's Exhibits A, B and C, which were referenced in, and attached to, the above affidavits, as required by Fed.R. of Civ.Pro. 56(e). Second, the materials entitled "Administrative Record" (Doc. 54) have been properly authenticated under Fed.R.Evid. 902(4) and Fed.R. of Civ.Pro. 44(a)(1), and have thus appropriately been considered. The mere fact that these documents have been authenticated, however, does not speak to the fact that some portions may contain hearsay. Accordingly, whenever a portion of the "Administrative Record" is referred to, any hearsay questions will be noted and resolved. Defendant has indicated in the brief memorandum filed on July 6, 1981, that the entire Administrative Record may be considered by the Court because the parties have stipulated to admissibility, and by virtue of the application of Fed.R.Evid. 803(6) and (8). The Court has previously noted that fact in its entry of June 29, 1981, but does not believe that such a stipulation can substitute for compliance with the Federal Rules of Evidence. In addition, the Court has concluded, as will later be seen, that the bulk of the materials submitted can be excepted from the hearsay rule under Fed.R.Evid. 803(6) rather than Fed.R.Evid. 803(8), as Defendant suggests. While the Court has no doubt of the authenticity of the Administrative Record, that fact alone cannot satisfy the requirements of Fed.R.Evid. 803(6), which mandates, *inter alia*, some indication that the memorandum be made at or near the time of the event in question, and in the regular course of business. Because the Court does not wish to unduly prolong the resolution of Defendants' Motion by filing yet another entry directing Defendant to comply with Fed.R.Evid. 803(6), the within entry will be filed without further delay. However, because the Court is aware of the almost certain authenticity of the materials submitted (due to the fact that the documents considered have been authenticated under Fed.R.Evid. 902(4), and have referred to by way of the Pitts and Weigle affidavits, as well as in the depositions submitted to the Court), and of the ease with which Defendant should be able to comply with Fed.R.Evid. 803(6) and 803(8) (where applicable), two determinations have been made: (1) the Administrative Record will be considered by the Court where necessary, pending submission of proper affidavits by Defendant; and (2) Defendant is given ten (10) days from date of receipt of this entry, to furnish the information required by the Federal Rules of Evidence; in other words, to properly authenticate the items in question as business records under 803(6). If that is done, this conditional order will be made final; if not done, this Court will reconsider its opinion.

Finally, the depositions of Weigle, Pitts and Brown have been carefully scrutinized and will be repeatedly referred to during this opinion. Although the depositions of Weigle and Pitts have not been signed as required under Fed.R. of Civ.Pro. 30(e), and the signatures have not been waived, no objection to this error has been made within a reasonable time after the failure to sign the depositions might have been discovered with due diligence. Fed.R. of Civ.Pro. 32(d)(4). As the depositions have been filed for seven months without objection by any party, the Court finds that any and all errors, including signature or failure to sign, have been waived. *Kawietzke v. Rarich*, 198 F.Supp. 841 (E.D.Pa.1961). With respect to Marvinell Brown's deposition, that document is also unsigned, but is accompanied by a certificate from the officer who prepared the deposition indicating that Brown failed to appear and sign her deposition. Since again, no objections have been raised concerning the use of this deposition, the Court finds that all irregularities have been waived. Fed.R. of Civ.Pro. 32(d)(4).

Briefly, the factual background presented to the Court indicates that Plaintiff Marvinell Brown, at the time of her employment by the ASD Computing Center, was a twenty-four year old black female, who had majored in mathematics in college, and had been awarded a Bachelor of Science Degree in 1975 from the University of New Mexico. Plaintiff began work at the ASD Computing Center on January 10, 1978, as a GS–7 Computer Scientist, and was required to serve a one year probationary period. During this time, Plaintiff expressed dissatisfaction with the training opportunities afforded to her. On December 13, 1978, prior to the completion of her probationary period, Plaintiff was notified that she would be terminated as an ASD Computing Center employee. On January 10, 1979, Plaintiff filed an appeal of that decision with the Merit Systems Protection Board, alleging discrimination in her separation from employment. When no decision had been rendered by the Board within one hundred and eighty days of the filing of Plaintiff's appeal, Plaintiff exercised her option, under 42 U.S.C. § 2000e–16(c), of filing a complaint directly with this Court. On September 4, 1979, after this action was filed, the Merit Systems Protection Board issued its decision, finding that Plaintiff's discharge was not discriminatory, and that Plaintiff had not been subjected to discriminatory treatment in her employment.

On October 23, 1980, the Government filed a Motion for Summary Judgment in the present action, contending that no genuine issues of material fact existed with respect to either the alleged discriminatory treatment of Plaintiff during her employment, or the retaliatory nature of her discharge. The Government further argued that, as a matter of law, it was entitled to summary judgment because Plaintiff could not establish disparate treatment or retaliation under the standards specified in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff replied to this Motion on November 13, 1980, by indicating areas in which she believed genuine issues of material fact existed.

Fed.R. of Civ.Pro. 56(c) provides with respect to summary judgment that:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

The rule is well established that in determining whether summary judgment is appropriate, "the pleadings are to be liberally construed in favor of the party opposing the motion," ... and "the court is required to take the view most favorable to the party opposing the motion, giving the party the benefit of all favorable inferences that may be drawn from the evidence." *McHenry v. Ford Motor Co.*, 269 F.2d 18, 22 (6th Cir. 1959) (citations omitted). With these factors in mind, the Court now turns to consideration of the factual and legal issues presented by the present action.

II. *Factual Analysis*

Although Fed.R.Civ.Pro. 52(a) does not require factual findings and conclusions of law to be made on decisions rendered under Fed.R. of Civ.Pro. 56, the Court feels that some discussion of the facts herein is appropriate, since a summary judgment determination depends in large part upon the existence or nonexistence of factual questions. Accordingly, after construing the facts contained by all the evidence presented, *most strongly* in Plaintiff's favor, the following facts are disclosed:

1. At the time she was hired by the ASD Computing Center, Marvinell Brown was a black female who had received a Bachelor of Science degree, with a major in mathematics, in 1975 from the University of New Mexico. (Brown deposition, p. 4) (hereinafter referred to as "Brown");

2. After her graduation in 1975, and prior to her employment at ASD, plaintiff worked as an actuary trainee with State Farm Insurance Company from March, 1976 to May, 1977, when she was terminated for alleged poor work performance. Plaintiff, however, believed that she had been discri-

minated against because of her race, and filed a lawsuit against State Farm. (Brown, pp. 9, 10, 11, 12);

3. From October 31, 1977, until she began her employment at ASD, Plaintiff was employed on a part-time basis as a math teacher at Alamagordo, New Mexico, High School. (Brown, p. 12);

4. The hiring procedure for Plaintiff's position as an ASD computer scientist worked as follows: Plaintiff was placed on the Civil Service Register; when a vacancy occurred at ASD, an audit was made of the employees at Wright Field; no appropriate candidates turned up on that audit, so the Civil Service Commission was contacted. The Commission furnished a list of applicants, of whom five were reviewed by ASD. Plaintiff's employment application was among those five reviewed, and she was interviewed on the telephone by someone from ASD. (Brown, p. 16; Deposition of Frederick Pitts, p. 7) (hereinafter referred to as "Pitts");

5. Frederick Pitts, a black male, had been the Chief of Computer Operations at ASD since 1972. (Pitts, p. 4; Pitts Affidavit, ¶ 1);

6. Pitts did not interview Plaintiff prior to her employment at ASD, but based his decision to hire her on the following factors: (a) She was well qualified for the position, due to her mathematical background, particularly in light of the fact that ASD traditionally hired mathematicians to perform systems-type work; (b) she was a minority applicant, and Pitts was aware of a need for black professionals in his organization; (c) Pitts had verified Brown's good mathematics background through one of her professors. (Pitts, pp. 9, 10, 17, 19);

7. Although Pitts was aware that Plaintiff had been fired from her last job, he didn't consider that fact significant in view of Brown's good academic credentials, the recommendation of her professor, and the need for a qualified minority applicant. (Pitts affidavit, ¶ 3);

8. Plaintiff was hired to be an entry level systems analyst trainee in the Management Systems Branch of the ASD Computer Center. Traditionally, when an open-ing existed in Systems Management, a programmer from the programming division of ASD would be promoted to the position of systems analyst. These individuals would enter with at least five years programming experience, and would be employed at a GS-12 salary rate. (Pitts, pp. 14, 18, 22);

9. Due to budgetary considerations (i. e., a need to reduce average salaries under a government program called High Grade Salary Control), a decision was made to downgrade the systems analysis vacancy from a GS-12 to an entry level GS-7 position, and to start a trainee in that position. (Pitts, pp. 18, 22);

10. Plaintiff was the first trainee that ASD had ever had in systems analysis. Due to Pitts' neglect or inexperience in the area of employing a trainee, ASD had no formal training plan for Plaintiff. Plaintiff's training program was poorly organized, and her supervisor, Captain Treadway did not know how to train her. (Pitts, p. 18, 24, Brown, 20, 25, 26);

11. During Plaintiff's first month of employment, she was given a self-study manual in Job Control Language, which she studied during her working hours and after work. She continued with this self-study program in February and March, 1978. On January 23 and 24, 1978, Plaintiff attended an IBM formal lecture in Cincinnati. (Brown, pp. 18, 19, 25);

12. During January, 1978, Plaintiff was also updating manuals, and writing down data, work which she considered "routine" and "clerical". (Brown, p. 18);

13. There were no clerical employees in Systems Management, except one secretary, who was assigned to the entire division. Updating manuals was considered by Pitts to be a regular part of the job of a systems analyst. Prior to the time Brown was hired, her task assignments had been performed by GS-12 and GS-13 systems analysts. (Pitts, p. 36, Pitts affidavit, ¶ 13);

14. In February, 1978, Plaintiff was assigned to work on the system analysis and resource accounting program (hereinafter SARA), which was a program designed to account for all resources used on the IBM Computers in the ASD Center. Previously,

no one had worked on the SARA program, due to a lack of time. Plaintiff considered the SARA work to be interesting and of a learning nature. In late March, 1978, Plaintiff attended a four day formal training course in SARA at Falls Church, Virginia. (Brown, pp. 21, 22, 23; Weigle deposition, pp. 21, 22) (hereinafter "Weigle");

15. When Plaintiff came to work at ASD, she did not know a lot about computers, but had the capability to learn. (Brown, p. 24);

16. Around the beginning of March, 1978, Plaintiff began expressing concern about her lack of a training program. As a result of their discussions with Plaintiff, Major Toumbacaris and Captain Treadway agreed to allow Plaintiff to prepare her own training schedule. (Brown, 28, 38);

17. Among the items listed in the training program devised by Plaintiff were assembler training, instruction in COBOL, and work on the Benchmark program. According to Plaintiff, she was given the Benchmark program to do when another employee left, but did not have time to do the work. Plaintiff did not receive training in COBOL, but did receive some formal training in assembler, which is the language of the computer, or the basic machine instructions for programming. (Brown, pp. 33, 34, 35; Pitts, p. 31);

18. Neither Captain Treadway nor Major Toumbacaris told Plaintiff that updating materials was a valuable training tool; Treadway indicated that Plaintiff needed to perform some productive work and could not spend all of her time learning. (Brown, p. 39);

19. Plaintiff met with Toumbacaris and Treadway approximately four times between March and July, 1978, in regard to the training problem. Treadway and Toumbacaris wanted to put assembler training off to a much later time than proposed in the schedule (July 1, 1978). Plaintiff did not accept their decision and appealed to Mr. Pitts in June, 1978. Pitts told her he disagreed with the others, and that she could begin working on assembler one hour per day in a self-study program. Pitts did not relieve Plaintiff from the job of updating manuals. (Brown, pp. 40, 41, 42, 43; Pitts, p. 31);

20. After the June meeting with Plaintiff, Pitts arranged a further meeting in June, 1978, between himself, Plaintiff, Treadway and Toumbacaris. At this meeting, which lasted approximately two and one-half hours, Plaintiff again expressed concern about her training schedule. Pitts responded to her concerns in a letter dated July 25, 1978, to which he attached a formal training schedule. In Pitts' opinion, Plaintiff was beginning over in her training, and he indicated this to Brown. (Pitts, 41; Pitts affidavit, ¶ 5);

21. In Pitts' letter of July 25, 1978, to Brown, he advised her of the value and learning function of various tasks which she had classified as routine. In addition, he informed her that she must follow directions and perform assigned tasks, and that a failure to do so would result in termination of her employment. [Admin. Rec. pp. 155–157] (This letter is not viewed by the Court as hearsay, because it is not considered as establishing either that these tasks were valuable, or that Plaintiff would be fired for non-performance of these items, but is rather considered as evidence that Plaintiff was advised of Pitts' opinion, and given a warning concerning job performance and possible termination, in July, 1978);

22. Plaintiff was disappointed in the strong language of Pitts' letter, but the letter did not scare her because she felt Pitts' interpretation was at fault. Plaintiff did not agree with Pitts' comments about updating manuals, and did not write a response to the letter. Plaintiff did, however, give Pitts a letter about clerical work written by Mr. Clayton of Personnel, because she felt that Treadway, Pitts, and Toumbacaris did not perhaps know that the amount of clerical work they were giving her was wrong. Plaintiff could not accept Pitts' decision on the updating of manuals, but tried to relate her feelings as positively as she could. (Brown, pp. 43, 44, 47, 49);

23. The training plan devised by Pitts in July, 1978, called for certain on the job training, self-study, and formal course work

beginning in September, 1978. Plaintiff was pleased with the training program developed by Pitts. [Admin.Rec. 158, 159, Brown, p. 46] (These matters are not considered hearsay because they are not evidence that Brown completed these tasks, but only evidence that the statements were made by Pitts);

24. In August, 1978, Plaintiff again requested, and was given permission, to meet with Pitts. At this meeting, Plaintiff again expressed concern over the value of some of her clerical duties, and Pitts once more advised her of the value of those tasks. Pitts also recommended that Brown seek counseling with Mr. Wilson, the Chief E.E.O. officer. (Pitts affidavit, ¶ 6);

25. Around August 1, 1978, Pitts rated Brown's performance as satisfactory, because she had the technical skills to perform her work. Further, the statements by Brown that she would not perform certain tasks (as noted in Pitts' letter of July 25, 1978), had been made to Pitts personally, and had nothing to do with Brown's prior work performance, which was the subject of the evaluation. Pitts felt that Brown possessed the ability to perform satisfactory work, but was not progressing sufficiently because of her attitude. (Pitts, pp. 61, 82, 83);

26. In the middle of August, 1978, Captain Harold Weigle was assigned to Wright Patterson Air Force Base, as Chief of the Management Systems Branch, and became Plaintiff's immediate supervisor. On September 8, 1978, Weigle met with Brown to discuss her concerns over training and clerical work. Brown stated that she raised the issue of training with Captain Weigle because he was "new bait", or another person that she could make understand what she was trying to say. On September 15, Weigle wrote to Brown, in response to her concerns, and indicated his opinion of the

learning value of tasks classified by Brown as clerical. Weigle also expressed his awareness of the fact that Plaintiff was considering talking to E.E.O., and asked her to give him a chance to work out existing problems. A copy of this letter was sent to Pitts, who then became aware that Brown still questioned her assignments and training. [Admin.Rec., pp. 17–18] (Brown, p. 50; Weigle deposition, pp. 4, 5, 6, 7 (hereinafter referred to as "Weigle"); Weigle affidavit, ¶ 2; Pitts affidavit, ¶ 7)) Again, Weigle's statements are not considered hearsay because they are not considered as proof of their truth but only for the fact that the statements were made. *See* footnote 1, *infra* ;

27. On September 11, 1978, Plaintiff attended a three or five day MRI System 2000 Basic Concepts Natural Language Course in Columbus, Ohio; on September 25, 1978, she attended a five day course in Cincinnati in IBM Principal Systems Design Evaluation; on October 9–10 and 11, 1978, Plaintiff attended formal courses in Cincinnati on Job Control Language; on October 16, 1978, Plaintiff was scheduled to attend a course in assembler, but did not stay for the program after she arrived, because in her opinion, she was not qualified to take the course. (Brown, pp. 95, 96, 97, 98);

28. On September 19, or 22, 1978, Plaintiff gave Pitts, Weigle, and Colonel Fass a letter indicating that she would go to the EEO Office. Colonel Fass advised Brown not to go to EEO, and told Brown of his plans to inform the personnel office that things were not working out for Brown because of her attitude. Fass also indicated that Brown's attitude was the reason for his plans to go to the personnel office. (Brown, pp. 54, 59) [Admin.Rec. p. 36 (Brown formal grievance)] [1]

29. During September, 1978, Pitts was present at a meeting between Brown and

---

1. These statements are appropriate for evaluation in conjunction with Defendant's motion for summary judgment because they are not considered to be hearsay under Fed.R.Evid. 801(c), which provides that "[h]earsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In *United States v. Miriani,* 422 F.2d

150 (6th Cir. 1970), the Sixth Circuit indicated that "[t]he hearsay rule excludes extrajudicial utterances only when offered to evidence the truth or falsity of the statements, not when offered to show that the utterances were made." *Id.* at 153.

The above statements are not being received, and will not be considered, as evidence that

Colonel Fass, Director of the ASD Computing Center. At that meeting, Brown raised the issues of her training and task assignments. (Pitts affidavit, ¶ 7);

30. On October 3, 1978, Pitts met with Brown and gave her a copy of a letter notifying her of deficiencies in performance and allowing her sixty days to show improvements in the areas outlined. The motivation for this letter included the Civilian Personnel Office's requirement for a ten month evaluation of the past performance of probationary employees, and for an indication of whether a future intent existed to hire that employee. In addition, Pitts was motivated to write the letter because of the

continuing disagreement with Brown over her training. (Pitts, pp. 56, 57; Pitts affidavit, ¶ 8);

31. In his letter of October 3, 1978, to Brown, Pitts indicated that Brown had deficiencies in the areas of attitude and cooperativeness. Specifically, he noted that she needed to improve in: (a) acceptance of task assignments as valued training tools; (b) willingness to accept management decisions; and (c) willingness to cooperate with the management of the ASD Computing Center. Pitts warned Brown that a failure to show improvement might very well result in termination of her employment. (Admin. Rec. 19–20)[2]

Fass actually did inform the personnel office that Brown was not working out because of her attitude, or that her attitude was in fact the reason for Fass' expressed intention; instead, they will be considered for the limited purpose of establishing that Fass did make the utterances in question. Likewise, Fass' statement about E.E.O. is regarded only as an indication that the statement was made, and not to establish whether or not Fass thought or desired that Brown should not carry out her intention to go to the E.E.O. Office.

2. This letter is not hearsay, insofar as it is submitted as evidence that the statements in the letter were made by Pitts. However, the contents of the letter do constitute hearsay to the extent that the statements therein are offered to prove that Brown was deficient in the areas listed, or that her later termination was premised upon a failure to remedy those deficiencies. Although Fed.R.Evid. 802 provides that hearsay is not admissible, Fed.R.Evid. 803 specifies certain types of hearsay which are not excluded from admission even though the declarant is available as a witness.

At first glance, Fed.R.Evid. 803(8) [hereinafter Rule 803(8)] would seem to provide the appropriate exclusion, herein, as that provision deals with records of public offices or agencies. Moreover, the Government has assumed in the authentication document submitted on July 6, 1981, that the documents in question are official records. However, the Court has determined, after an examination of Fed.R.Evid. 803, as well as the relevant case authority, that Fed.R.Evid. 803(6) [hereinafter Rule 803(6)] establishes a more relevant basis for assessing the document in question.

Rule 803(8) is not an appropriate exemption for the document in question, because Pitts' July 25, 1978, letter does not fit within any of the categories outlined in section 8. Although this matter will be discussed in more detail later, the Court notes briefly that Rule

803(8)(B) and (C) are not applicable herein since there is no indication that Pitts was under any legal duty either to observe matters and report thereon, or to conduct investigations. (By way of contrast, however, consideration of the November, 1978, Notice of Separation sent to Brown may well be governed by Rule 803(8), because such a notice is required under 5 C.F.R. § 315.804 when an employee is being terminated.) Moreover, although subsection (A) of Rule 803(8) seems initially applicable, that exemption does not pertain to the letter under consideration, for reasons which will later be clarified. Assuming that Rule 803(8)(A) were appropriate herein, the Court would hesitate to use that subsection because unlike Rule 803(6), it does not contain a provision allowing for exclusion on the basis of lack of trustworthiness. Thus, having eliminated Rule 803(8) from consideration, Rule 803(6) appears as the most relevant exemption permitting the Court to consider the hearsay matters herein in conjunction with Defendants' Motion for Summary Judgment.

Under Rule 803(6), a hearsay statement may be admitted, or considered by the Court, if it is a record of regularly conducted activity, which may be:

A memorandum ..., in any form, of acts, events, ... made at or near the time by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make that memorandum ... all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

At present, the law appears to be unsettled with respect to whether the business records exception contained in Rule 803(6) applies to the admission of governmental agency or office records. In *United States v. American Cyanamid Co. (Cyanamid)*, 427 F.Supp. 859 (S.D.N.

Y.1977), the Court considered whether the admissibility of internal memoranda of the Justice Department would be governed by Rule 803(8), and if not, what other provision in Rule 803 should apply. The Court concluded, without discussion, that: (1) the business records exception in Rule 803(6) did not apply; (2) Rule 803(8), while generally appropriate for evaluation of government records, could not be used because the documents under consideration did not fall within the exemptions listed in Rule 803(8); and (3) the residual hearsay exception in Fed.R.Evid. 803(24) [hereinafter Rule 803(24)] would be the correct standard for determining the admissibility of the memoranda. *Id.* at 867. Unfortunately, the Court neglected to furnish even minimal justification for discarding Rule 803(6), or for resorting to the Rule 803(24) exemption, which was intended by Congress to be used "very rarely and only in exceptional circumstances." *Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir. 1979) (citations omitted).

The approach taken in *Cyanamid* was followed in essence by the Ninth Circuit in *United States v. Orozco*, 590 F.2d 789 (9th Cir. 1979), cert. denied 442 U.S. 920, 99 S.Ct. 2845, 61 L.Ed.2d 288 (1979), wherein the Court stated that although governmental functions could be included within the definition of "business" in Rule 803(6), the need to do so had been obviated by Rule 803(8), which was classified as the "business records exception for public records." *Id.* at 793. Perhaps this conflict could be resolved by distinguishing between "public" records and those which represent the internal matters within an agency, but the cited cases did not appear to make any such distinction. In particular, the Court in *Cyanamid* rejected any potential applicability of Rule 803(6) to government records by resorting to the residual hearsay exception in Rule 803(24). *Cyanamid*, 427 F.Supp. at 867.

Other cases have held that Rule 803(6) may be used to determine the admissibility of governmental agency records. For example, in *United States v. King*, 613 F.2d 670 (7th Cir. 1980), Social Security Administration forms were considered admissible as business records under Rule 803(6). *Id.* at 673. Cf.: *United States v. Bowers*, 593 F.2d 376, 380 (10th Cir. 1979), cert. denied 442 U.S. 852 (1979) [postal report admissible as business record under Rule 803(6)]; *see also Tashnizi v. Immigration and Naturalization Service*, 585 F.2d 781, 783 n.1 (5th Cir. 1978) (implicitly recognizing that a letter would be admissible under Rule 803(6) if properly identified as having been received in the regular course of business by the Immigration and Naturalization Service). Regretfully, the Courts in these decisions also failed to explain the rationale underlying their assumption that Rule 803(6) would apply to government records. Therefore, in view of the sparse reasoning contained in all the pertinent authority, this Court must, and would in any event, conduct its own survey of the language contained in Rules 803(6) and (8), and also examine the legislative history of the Federal Rules of Evidence, to determine whether Rule 803(6) may properly apply to the consideration of government records not falling within the categories established by Rule 803(8).

Prior to the adoption of the Federal Rules of Evidence in 1975, hearsay contained in agency memoranda or records could be admitted into evidence either under 28 U.S.C. § 1732 (1970) (hereinafter § 1732), as writings made in the ordinary course of business, or under 28 U.S.C. § 1733 (1970) (hereinafter § 1733) as official records of an agency (assuming that other prerequisites for admission, not relevant herein, had been met). Although the distinction between these sections may seem problematical, in that both permitted admission of governmental agency records, the courts have interpreted § 1733 as applying to "public documents" *United States v. Karnap*, 477 F.2d 390, 391 (4th Cir. 1973), and official "statements prepared by public servants as part of their official duties." *Laporte v. United States*, 300 F.2d 878, 881 (9th Cir. 1962). This approach followed the very narrow language of § 1733, which limited admission of government records under that section to "[b]ooks or records of account or minutes of proceedings," or in other words, formal or official agency documents. On the other hand, although § 1732 as originally enacted, 62 Stat. 869, 945–946 (1948), did not contain language including governmental agencies within the definition of "business," courts have traditionally considered agencies to be businesses for purposes of § 1732. 300 F.2d at 880; *Moran v. Pittsburgh-Des Moines Steel Co.*, 183 F.2d 467, 473 (3rd Cir. 1950).

When the Federal Rules of Evidence were enacted, Rule 803(8) was considered to have been derived from § 1733, while § 1732 was cited as the Statutory Source for Rule 803(6). H.R.Rep.No.93–650, 93rd Cong. 2d Sess., reprinted in [1974] U.S.Code Cong. & Ad.News 7051, 7075, 7091. The assumption must be made that Congress was aware of the current status of court interpretations of §§ 1732 and 1733 when it enacted Rules 803(6) and 803(8). *United States v. Smith*, 521 F.2d 957, 968, n.24 (D.C.Cir.1975). Despite this awareness, Congress failed to manifest an intention to alter the traditional interpretation of §§ 1732 and 1733, to eliminate governmental agencies from the purview of Rule 803(6), or to confine consideration of agency materials to Rule 803(8) only.

The statutory language used in Rules 803(6) and 803(8) differs in some respects from that contained in § 1732 and § 1733, but not in a manner pertinent to the matters under consideration herein. For example, Rule 803(8) does expand the scope of § 1733 somewhat by permitting admission of such items as factual findings made in an agency investigation. However, the restrictive "official documents" tenor of § 1733 has been preserved in Rule 803(8) by the added requirement that the items admitted must be "matters observed pursuant to a *duty imposed by law* as to which matters there was

a *duty to report*," or must be "factual findings resulting from an investigation made pursuant to *authority granted by law.*" (emphasis added).

Although Rule 803(8)(A) appears to be broad enough to include hearsay which is contained in agency documents not required or authorized by law, that provision cannot be read in so expansive a manner. First, as previously noted, subsection (A), unlike Rules 803(6) and 803(8)(B) and (C), does not contain a provision permitting exclusion where a lack of trustworthiness is found in otherwise admissible materials. Moreover, there is a noticeable lack in subsection (A) of any requirement that the report in question be prepared or transmitted by a person with knowledge, or that it be made at or near the time of the event in question. Absent these indicia of reliability, or any method of exclusion for lack of trustworthiness, the Court feels that interpreting subsection (A) to include matters such as internal agency memoranda would establish an undesirable precedent. These factors, without more, would mandate a conclusion by this Court that Rule 803(8)(A) could not serve as a general "catch-all" exemption for all government records not covered under Rule 803(8)(B) and (C). However, in addition, the House debate on the Proposed Rules of Evidence indicates that Congress intended to restrict, rather than broaden, the application of Rule 803(8). Specifically, Representative Holtzman moved to amend 803(8)(B) by inserting the words "as to which matters there was a duty to report." 120 Cong. Rec. 2387 (remarks of Rep. Holtzman). Holtzman indicated that the amendment was offered to narrow and restrict Rule 803(8)(B), and to prevent the admission of random observations made by a government employee in the course of his duty. *Id.* at 2387. Representative Dennis, a supporter of the amendment, further stated that:

> The gentlewoman would add "as to which matters there was a duty to report."
> Again it is a matter of judgment, but the difference would be this: Supposing you had a divorce case and you tried to put in a report of a social worker, rather than putting the social worker on the stand; under the committee's language anything she said in the report which would be observed by her pursuant to her general duties would be admissible. Under the amendment, only those things as to which she had some duty to make a report would be admissible.
> If the law required her to observe and report certain things about a condition in the home, that could come in, but if she put in a lot of other stuff there, she could not put that in without calling her as a witness and giving the opposition a chance to cross examine her.

120 Cong.Rec. 2387 (remarks of Rep. Dennis). Given then, the express concern of Congress over restricting subsection (B), it would be incongruous to conclude that legislative intent could be circumvented by interpreting subsection (A) so expansively, particularly when that provision does not, as indicated, allow for exclusion of hearsay on the basis of its unreliability.

With respect to Rule 803(6), there does not appear to be any intent on the part of Congress to alter the traditional operation of § 1732, or to prohibit agency records from being admitted as business records. Again, the Court emphasizes that under § 1732, "business" had been interpreted to include government agencies. The only major legislative discussion over Rule 803(6) occurred in conjunction with the attempt by the Supreme Court to broaden the traditionally accepted operation of the business records rule by extending its scope to any regularly conducted activity. S.Rep. 93–1277, 93rd Cong.2d Sess., reprinted in [1974] U.S.Code Cong. & Ad.News 7051, 7063. That discussion, however, is not relevant to the issue herein since government records were already included in the traditional interpretation of the business records rule. Additionally, there is no question that the traditional operation of the rule was left substantially intact except for the extension of coverage to be non-profit institutions such as schools and hospitals. Conf.Rep. No.93–1597, 93rd Cong.2d Sess., reprinted in [1974] U.S.Code Cong. & Ad.News 7098, 7104.

An examination of the relevant Senate and House Reports, as well as the transcripts of the hearings before both Houses of Congress, *see*: Proposed Rules of Evidence: Hearings on H.R. 5463 Before the Special Committee on Reform of Federal Criminal Laws of the House Committee on the Judiciary, 93rd Cong. 1st Sess. (1973); On the Federal Rules of Evidence: Hearings on H.R. 5463 Before the Senate Committee on the Judiciary, 93rd Cong., 2d Sess. (1974), indicates a significant lack of concern, or discussion, over the possibility that government records would be excluded from the purview of Rule 803(6). The only comment in regard to that possibility was generated during the testimony of Paul F. Rothstein, a professor of law at Georgetown University Law Center. *Id.* at 215. Rothstein urged that the broad Supreme Court definition of business records should be adopted, and noted that there might otherwise be questions about whether low-level government records would qualify under Rule 803(6). *Id.* at 231. Rothstein did not define the term low level government records, but indicated in his prepared statement that the more narrow House definition would be acceptable if construed broadly to include institutions such as schools and hospitals. *Id.* at 276. This concern was mentioned by the Senate in its report. S.Rep. 93–1277 at 7063, and the Conference Committee responded by substantially broadening the Rule 803(6) definition of business to include institutions and associations, whether or not conducted for profit. Conf.Rep. No.93–1597, at 7104; Rule 803(6). The more narrow House definition was then adopted as Rule 803(6).

32. Brown was upset with the October 3rd letter, because it was the first time she had been told she had deficiencies. At the same time, Brown was not upset because she felt Pitts had overreacted in his July 25, 1978, letter, and she did not give either that letter or the letter of October 3rd any credibility. Brown did not interpret Pitts' letter to mean that she could no longer communicate her feelings, or go to Weigle and "try to sway him." (Brown, pp. 54, 55);

33. In October, 1978, two comparable entry-level trainees were assigned to the Management Systems Branch of the ASD Computing Center. These employees were Lieutenant James Owens, a white male, and Lieutenant James Pinckney, a black male. The ASD Computing Center did not request the services of the lieutenants, as the Air Force assigns officers to work in their specialties. Both lieutenants had degrees in Computer Science, and Pinckney had worked as a programmer before coming to the ASD Center. Brown felt that both lieutenants' experiences and skills were more advanced than hers were when she first came to the Computing Center. (Pitts, p. 73; Pitts affidavit, ¶ 14; Brown, p. 65);

34. During October, 1978, Weigle and Brown met on approximately a weekly basis with regard to Brown's concern over the value of her task assignments. (Weigle affidavit, ¶ 3);

35. On October 16, 1978, Weigle sent Brown a memo outlining her duties and responsibilities. On October 24, 1978, Brown sent Weigle a memo stating that "there were too many miscellaneous jobs to be done that were routine," and suggesting that her jobs could be easily spread among the members of the systems group. In addition, Brown requested documentation of how many hours per week should be spent on the SARA project. (Weigle, 11; Weigle affidavit, ¶ 4) [Admin.Rec. pp. 74–75][3]

36. After Weigle's letter of October 16, 1978, Brown continued to question her

---

The preceding discussion has indicated that, in the present context, the enactment of the Federal Rules of Evidence did not alter the prior operation of §§ 1732 and 1733, insofar as they related to the admission of agency or office records. Therefore, the Court concludes that the document in question may be proper for consideration by the Court, in conjunction with Defendants' Motion for Summary Judgment, under the standards outlined in Rule 803(6).

As noted, Rule 803(6) indicates that a record made in the course of a regularly conducted business activity may be considered by the Court if certain criteria have been satisfied, and unless there appears to be a lack of trustworthiness in either the source of information for the document, or in its method of preparation. Because the Defendant has not yet strictly complied with Rule 803(6), the Court cannot at this time state with certainty either that the October, 1978, letter from Pitts to Brown can be excepted from the hearsay rule, or if excepted, that there are no indicia of unreliability which would further exclude that document under Rule 803(6). However, as previously indicated in the main text of this conditional entry, the letter under consideration has been authenticated under Fed.R.Evid. 902(4), has been referenced in the affidavits submitted, and has been referred to in the depositions of Brown, Pitts and Weigle. These factors indicate that this document will almost certainly be subject to proper verification under Rule 803(6). Moreover, the same factors demonstrate no basis at present for concluding that the October 3, 1978, letter should be excluded due to unreliability of information in preparation if otherwise proper for consideration under Rule 803(6). Pending submission of the materials required under Rule 803(6), however, the Court makes no final determination with respect to these matters, but reserves the option to exclude any materials for which proper documentation has not been provided. In the event that the Defendant does comply with Rule 803(6) to the Court's satisfaction, the Court notes now that the October 3, 1978, letter and the statements contained therein are relevant insofar as they pertain to Plaintiff's discharge.

3. Again, these statements are appropriate for consideration in conjunction with Defendant's motion for summary judgment because they are not considered to be hearsay. See discussion in Footnote 1, supra. The statements made by Brown are not viewed by the Court as proof that, in fact, Brown's tasks were routine, or that her jobs could be disseminated among the members of the systems group. They will be construed as evidence that the utterances in the document were made. Likewise, Brown's request for documentation is not received or viewed as evidence of whether or not she actually wished documentation, but only as establishing that such a request was made.

training, because Weigle was "responding back" to her. (Brown, p. 57);

37. On October 27, 1978, Weigle sent Brown another letter, in which he responded to Brown's memo of October 24th. In this letter, Weigle outlined the educational benefits of the tasks assigned to Brown and documented the amount of time she should spend on each task per week. Pitts received copies of Weigle's October 16 and October 27 letters to Brown. After Brown received Weigle's October 27, 1978, letter, she wrote letters in response, seeking "understanding." (Weigle, p. 18; Weigle affidavit, ¶ 5; Pitts affidavit, ¶ 9; Brown, p. 57) [Admin.Rec. p. 23–24] [4]

38. On October 16, 1978, Brown filed a written grievance, which she thought would "get people involved and straighten out the misunderstanding." In this grievance, she listed her concerns as "lack of training, no management support, and insensitivity of some co-workers." Again, Brown mentioned the routine nature of her task assignments, and asked for an on-the-job training schedule. In Brown's grievance, she did not allege sex or racial discrimination, based on advice from the EEO Officer, Wilson. (Brown, 58) [Admin.Rec. pp. 29, 32, 34] [5]

39. After Brown expressed concern over the amount of clerical work she was required to perform, some of her more routine duties were reassigned to the new arrivals, Lieutenants Owens and Pinckney. These lieutenants were, as of October 29, 1980, performing the task assignments formerly given to Brown. (Brown, p. 72; Pitts, p. 78, 79, Weigle affidavit, ¶ 8);

40. In October, 1978, Brown was given an assignment of planning a new disc sub-system replacement. The initial report on the project was due on December 18, 1978. Prior to that date, Brown and Weigle had discussed the program two or three times and Brown stated either that it was too early to start the task because the data would be meaningless, or that she did not have time to perform the work. Brown did not start the task as Weigle had requested, and although he did not agree with Brown that it was too early to do the work, he agreed to give her an extension. Weigle mentioned to Pitts that he had assigned a task but Brown had not completed it. (Weigle, pp. 24, 25, 26, 27, 28, 29; Brown, pp. 103, 104);

41. On November 2, 1978, after having observed no improvement in Brown's performance, Pitts submitted a written probationary evaluation form recommending that Brown be separated. Pitts told Brown that he would continue his evaluation for another thirty days to determine if she made any improvement in her performance. (Pitts affidavit, ¶ 9);

42. On November 21, 1978, Weigle developed a course schedule for all employees in the Management Systems Branch, including Brown, Pinckney and Owens. This schedule provided for similar training for all employees in the department. Weigle developed the plan because he had been requested to estimate how much money would be needed for training during the next year. (Weigle, p. 44; Weigle affidavit, ¶ 7; Pitts affidavit, ¶ 14);

43. Lieutenant Pinckney was scheduled to begin course work on the assembler on March 26, 1979, and Lieutenant Owens was scheduled to begin assembler training on May 26, 1979. (Exhibit B Attached to Defendant's Motion for Summary Judgment) [6]

---

4. The statements in Weigle's October 27, 1978, letter are not considered as hearsay, because they are not offered or considered, as proof of the value of Brown's assigned tasks, or as evidence that the amounts of time assigned to those tasks were accurate reflections of the time required.

5. The comments in Brown's grievance letter are not hearsay, *see* Footnote 1, *supra*, because they are not considered, as proof of the truth or falsity of Brown's concerns or beliefs, but are regarded merely as evidence that these statements were made by Brown.

6. Exhibit B is not deemed to be hearsay in that it is not considered as proof that the lieutenants began course work on the dates indicated; it is regarded by the Court only as evidence establishing that statements were made with respect to when training was scheduled to begin. Assuming, *arguendo*, that Exhibit B is hearsay, it is excluded from the operation of the hearsay rule under Fed.R.Evid. 803(6). *See* Footnote 2, *supra*. The Court finds, moreover, no lack of trustworthiness in the method of preparation of Exhibit B (as outlined in Foot-

44. Around the end of November, 1978, Brown was involved in an incident which caused a temporary shutdown of computer operations. Although there is no dispute that the time specified for running systems jobs was set between 6:00 a. m. and 7:30 a. m., that Brown ran her systems jobs after the regularly authorized time, or that Weigle never instructed Brown to run jobs after the time allotted, there are disputes concerning whether Brown was specifically instructed not to run systems jobs after the authorized time, and with regard to whether running systems jobs after the regularly scheduled time was a matter of individual judgment and could be done as long as the computer system had not "come up" so as to be in operation. (Brown, pp. 100, 101, 102; Weigle, pp. 29, 30, 31, 34, 35; Pitts, pp. 69, 70);

45. Whether the problem in the main system was caused by Brown's actions or by a field engineer, Thompson, who was also working on the computer, was unknown, but the damage to Brown's own job would not have occurred if she had not done the work at that particular time. Pitts did not investigate the incident but was told about the incident by Weigle. Pitts was upset because if Brown had not processed her work at that time, the responsibility for the failure would obviously have been with the field engineer. (Weigle, pp. 32, 35, 36, 39; Pitts, pp. 65, 66, 70);

46. Weigle indicated that he had trouble communicating with Brown and cited as a specific example his attempt to relate to her his concern, in November, 1978, not that the computer system was "down" but that certain times were allocated for systems jobs. Brown's only recollection of the discussion is that Weigle was concerned with the fact the system was down, and that no mention had been made of the times that jobs were to be run. (Weigle, p. 39; Brown, pp. 102, 103);

47. On December 11, 1978, Pitts wrote a letter to Brown, indicating that he was returning her informal grievance package of December 8, 1978, without further action, because the issues raised therein were the identical issues which had been discussed with Brown by Pitts, and by Brown's immediate supervisors on several occasions. [Admin.Rec. 11] [7]

48. Once Brown had been told by the members of management that in their opinion the tasks assigned to her were valuable, she did not ever say that although she did not agree with them, she would not raise the issue any more. Brown did not feel that she had been told to stop communicating her feelings. (Brown, pp. 52, 55);

49. Pitts did not note any improvement in Brown's performance, and on December 13, 1978, he sent her notice that she would be separated, effective January 3, 1979. In this letter, Pitts gave as reasons for the separation, the same reasons which had been listed as deficiencies in Brown's performance in the October 3, 1978, letter. Pitts also indicated that Brown had been counseled repeatedly in the last six months, and listed specific instances, including his July 25, 1978, and October 3, 1978, letters to Brown. [Admin.Rec. p. 246] [8]

note 2, *supra*, again pending submission of proper materials by Defendant), and further finds that the information contained therein is competent and is relevant to the issue of the differences between the training opportunities afforded Brown, Pinckney and Owens.

7. Insofar as this document contains hearsay, it is deemed proper for consideration by the Court in ruling upon the motion for summary judgment. *See* Footnote 2, *supra*. There are no indications at present of a lack of trustworthiness of this document (as outlined in the discussion in Footnote 2, *supra*, and pending submission of proper materials by Defendant), and the Court feels it to be relevant, particularly insofar as it discloses Pitts' state of mind at that time and his awareness of Brown's attempt to further raise the issues of her training and assigned duties.

8. To the extent that this document is considered as proof of the fact that the statements in the letter were made, or were the reasons given for Brown's separation, they are not hearsay. To the extent the statements in the letter are considered for the truth of those statements, they are appropriate for consideration under *Fed.R.Evid. 803(8)(B) as matters observed* pursuant to a duty imposed by law, *see* Footnote 2, *supra*, or in the alternative, under *Fed.R.Evid. 803(6)* as records of the type customarily made in the course of a regular business activity, i. e., the separation of employees. In this latter event, the Court finds no indicia of unreliability on the present record. (Again, see

50. Pitts also noted in his December 13, 1978, letter that Brown's deficiencies had continued, and listed as examples: (a) an incident where Brown had disagreed with her supervisor regarding the necessity for beginning a task; (b) the fact that attempts to alleviate Brown's repeated complaints over excess routine work were met with the response that reassignment was unfair because Brown could complete the tasks if she was given overtime; and (c) Brown's failure to accept guidance offered by her supervisor on November 30, 1978, concerning interruption of computer operations. [Admin.Rec., 247] [9]

Before proceeding with the legal analysis required herein, the Court wishes to emphasize several significant points. First, the Court firmly reiterates its previous statement that all inferences in the evidence have been, and will be construed with the utmost diligence, in favor of Plaintiff's claim that she has been discriminated against because of her race and sex. Moreover, the factual history outlined above has been construed only after a searching scrutiny of the record, and must be viewed as an essentially neutral recitation of events which have been reviewed for clarification and to reveal those factual matters, if any, which might be in dispute. Additionally, in setting forth the foregoing factual summary, the Court has, at every conceivable opportunity, adopted Plaintiff's interpretation of the event in question and has deliberately omitted or disregarded those inferences which conflict with, or negative, that interpretation. This approach has been utilized because of the Court's desire to afford all litigants with a full and fair hearing of all claims. With these factors in mind, the Court now turns to an analysis of the legal standards under which Plaintiff's allegations of discrimination in training opportunities and retaliatory discharge may be evaluated.

### III. *Legal Analysis*

■ 42 U.S.C. § 2000e–2(a) provides that: It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin.

Further, 42 U.S.C. § 2000e–3(a) states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this chapter." 42 U.S.C. § 2000e–16(a) prohibits the federal government from engaging in sex or racial discrimination with regard to all personnel actions affecting employees. Although the provisions of §§ 2000e–2 and e–3 of Title 42 are not specifically incorporated into 42 U.S.C. § 2000e–16, the Supreme Court has ruled that federal employees are accorded "the full rights available in the courts as are granted to individuals in the private sector under title VII." *Chandler v. Roudebush*, 425 U.S. 840, 841, 96 S.Ct. 1949, 1950, 48 L.Ed.2d 416 (1976). Therefore, the Court may appropriately consider Plaintiff's claims of retaliation, although that phrase is not contained in 42 U.S.C. § 2000e–16, as well as the allegations pertaining to discrimination in training opportunities and employment termination.

On March 26, 1980, Plaintiff filed her Amended Complaint with this Court, in which she alleged that she had been unlawfully discriminated against by virtue of her race and sex in that she was not provided with appropriate training opportunities in her employment, was subjected to retaliatory harassment, and was wrongfully discharged. The Court's analysis of these

---

discussion in Footnote 2, *supra*, conditioning the Court's opinion on proper Rule 803(6) authentication by Defendant) with regard to those factors outlined in Rule 803(6). Further, the information contained in the letter is viewed by the Court as relevant in that it pertains to the central issues in the present case.

9. Again, these statements are not hearsay, or if hearsay, are proper for consideration, are presently thought to be reliable, and are relevant, for the reasons listed in the preceding footnote, and in Footnote 2, *supra*.

claims will be accomplished in the following manner: the legal standards applicable to each allegation will be discussed; an examination of the facts will be conducted in order to determine whether any material issues of fact exist; if no material issues of fact are in dispute, the Court will then consider whether, under the legal principles articulated, the Government is entitled to summary judgment as a matter of law.

### A. Discrimination in Training Opportunities

■ As noted, Plaintiff has claimed discrimination in that she did not receive the same training opportunities as did similarly situated whites and/or males. Thus, Plaintiff's claim, reduced to its essence, is one alleging a disparity in treatment, rather than disparate impact. Although Plaintiff is not required to choose between disparate impact and disparate treatment theories, the Court is entitled to consider whether either or both theories are presented by the evidence. *Wright v. National Archives & Records Service*, 609 F.2d 702, 711, n.6 (4th Cir. 1979) (*Wright*). The Supreme Court in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (*Teamsters*) defined disparate treatment as follows:

> "Disparate treatment" ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. *Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.*

*Id.* at 335, n.15, 97 S.Ct. at 1854, n.15 (citation omitted) (emphasis added). The Court then distinguished disparate treatment cases from impact cases by noting that disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* at 336, n.15, 97 S.Ct. at 1855, n.15. The Court further noted that in impact cases, proof of discriminatory motive is not required. *Id.* at 336, n.15, 97 S.Ct. at 1855, n.15 (citations omitted).

In the present case, Plaintiff's claims, and the evidence pertinent thereto, clearly do not relate to a procedure which is facially neutral but which operates to perpetuate the "status quo of prior discriminatory practices," *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), and thus, to consider the within matter under a disparate impact analysis would constitute precisely the "undisciplined extension" of that doctrine condemned in *Wright*, 609 F.2d at 713. Rather, Plaintiff's allegations are that she was afforded unequal training opportunities, or given treatment which differed from that accorded to similarly situated white and/or male employees. Therefore, the Court's analysis of Plaintiff's claims will be confined to those matters pertinent to the issue of disparate treatment.

In evaluating cases brought under Title VII, the beginning point for discussion is generally the standard established for a prima facie case of discrimination by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), with modification for varying factual patterns. *Id.* at 802, n.13, 93 S.Ct. at 1824, n.13. Although this standard has been applied almost universally, *Flaig v. Bendix Corp.*, 488 F.Supp. 336, 338 (E.D.Mich.1980), this Court agrees with the statement in *Dickerson v. United States Steel Corp.*, 439 F.Supp. 55 (E.D.Pa.1977), that "[t]he shared element in these methods of proof is that each requires a plaintiff to show a disparity, or difference, in his condition as compared to other non-minority individuals. Therefore, in order to meet this initial burden, the plaintiff must show such a disparity in treatment or status." *Id.* at 64.

■ The evidence herein, presented in the very most preferential light to Plaintiff, reveals that there are no genuine issues of material fact with respect to Plaintiff's treatment as compared to other non-minority individuals. As noted in the preliminary recital of facts, Plaintiff's trainee position represented a departure from ASD's traditional policy of filling systems analyst va-

cancies by promoting qualified programmers with several years of programming experience. The sole reason for this deviation was a desire, motivated by government financial policy, to reduce the average salary level in the Computing Center. While Plaintiff did not have a formal written training plan in the first six months of her employment, other than what she devised, there is no requirement under Title VII that such a plan be provided. Additionally, there is no indication that the failure to furnish such a plan was motivated by any reason other than the fact that Plaintiff's supervisors had never had a systems analyst trainee before.

Although Plaintiff's supervisor, Captain Weigle, prepared an outline of anticipated course work for the two similarly situated lieutenants, Pinckney and Owens, approximately one month after they were assigned to ASD, the lieutenants were not treated in a preferential manner, for the following reasons: (1) Mr. Pitts, the Chief of the Management Systems Branch, admitted that he had never had a trainee in Brown's position, and did not plan efficiently; (2) as soon as Pitts became aware of Brown's concern over training, he prepared a formal, detailed training plan for her; (3) there is no indication that a similar training plan was ever developed for the lieutenants; (4) Plaintiff's original supervisor, Captain Treadway, was characterized by Plaintiff as being "lost" in regard to how to train her, and had been replaced by Captain Weigle by the time of the arrival of the two new trainees; (5) Weigle, who was characterized by Plaintiff as being "more on top of things" than his predecessor, prepared the November, 1978, course schedule in response to an administrative request for a list of anticipated training costs for the following year; (6) Plaintiff was included in the November schedule, on the same basis as all other employees, including Owens and Pinckney; (7) the plan prepared by Weigle included equal training for Brown, Owens, and Pinckney. (Brown, pp. 61, 67).

Plaintiff indicated in her deposition that the lieutenants were also treated in an un-equal manner because they were sent to an assembler course at a much faster rate than she had been sent. (Brown, p. 68). However, there are no issues of material fact with respect to the treatment accorded to Brown, Owens, and Pinckney in this regard. Exhibit B indicates that Owens and Pinckney were scheduled to attend assembler workshops in May, 1979, and March, 1979, respectively,[10] while Plaintiff attended an assembler course in October, 1978, three months after her training had been started anew by Pitts. In comparison, the assembler training of the two lieutenants was scheduled to begin between five and seven months after they were assigned in the Computing Center. Thus, no difference can be seen in the treatment of the three similarly-situated employees. Although Plaintiff's training was begun over in July, 1978, the Court has already concluded that fact was not due to discrimination on the part of ASD, and did not constitute treatment different from that accorded to similarly situated employees.

Plaintiff also indicated that the lieutenants were treated preferentially because they were required to perform less clerical work. (Brown, p. 71). At the time Brown entered employment with ASD as a GS–7 trainee, there were no other similarly situated employees, as the rest of the systems analysts were at least at a GS–12 level, were fully qualified analysts, and had several years of programming experience. By contrast, Plaintiff indicated that she did not know a lot about computers at the time of her employment. (Brown, p. 24). Given this background (and construing the facts most strongly in Plaintiff's favor, to give full credence to her claim that she was required to perform routine clerical work insofar as updating manuals and writing down data was concerned), the Court is unable to find any inference of discrimination in the fact that Plaintiff, as a new, inexperienced trainee, was assigned tasks formerly performed by experienced analysts. Reduced to its essence, the conclusion is inescapable that Plaintiff was not

10. See Footnote 6.

treated in a manner disparate to other *similarly situated* employees (emphasis added).

Plaintiff has contended, in a memorandum filed with the Court (Doc. 55), that she was subjected to disparate treatment because she was unqualified for the position for which she was hired, and should have been given programming experience. In support of this contention, Plaintiff has cited the fact that other systems analysts employed by ASD did possess programming experience. However, assuming that this is true, the Court fails to discern either the relevance of these facts, or their potential connection with Plaintiff's allegations of disparate treatment. First, as indicated, there is no dispute that Plaintiff's trainee position was unique, and that there were no other similarly-situated employees in systems analysis. Also, at the time Plaintiff was hired, there were no other professional entry-level employees at the Center who could have filled the trainee position. (Pitts, p. 21). The Court has been unable to find any indication that Plaintiff, as a GS-7 trainee, was expected to possess the experience or qualifications of a fully-trained GS-12 systems analyst. In fact, Pitts' testimony reflects an opposite expectation. (Pitts, pp. 20, 23, 24). There is also no evidence to indicate that Brown was not qualified to perform a trainee function. Pitts hired Brown based on her mathematics background, because ASD traditionally hired mathematicians for systems analysis work. Pitts also indicated that Brown possessed the technical skills to perform her work. Further, when Plaintiff was offered an opportunity in June, 1978, to transfer into the programming division to obtain programming experience, she refused, because a position in the systems department outweighed an applications position. (Brown, p. 99; Pitts, pp. 32, 33). Thus, based on these factors, the Court finds no issues of fact concerning Plaintiff's hiring or qualifications. The undisputed facts indicate that she was qualified for her position and was, in fact, offered an opportunity to obtain programming experience, had she desired.

Moreover, there are no disputed facts with regard to the equality of Plaintiff's task assignments in comparison to the other similarly situated employees who were eventually assigned to ASD. Brown indicated that the new lieutenants did update manuals, and were assigned some of the routine tasks about which she had complained. (Brown, p. 72). Although Brown stated that the total amount of updating done by the lieutenants did not equal that which she performed (Brown, p. 73), that situation had been caused by the receipt of a new set of manuals for the ASD operating system, and occurred when Brown was the only trainee. There is no indication that a similar situation occurred after the assignment of the two lieutenants as trainees. (Brown, pp. 72, 73; Pitts, p. 35). After Brown's departure from ASD, the two lieutenants performed the tasks previously assigned to her. Accordingly, there is no indication in the record that Brown was treated less favorably than Owens or Pinckney in terms of her task assignments.

Finally, although this issue was not specifically raised by Brown, there do not appear to be any disputed issues of material fact with respect to the training actually given to the three similarly situated employees. The testimony of Weigle, which is uncontradicted, indicates that the training of Brown, Owens and Pinckney was equal, and that their respective areas of responsibility (SARA, CICS and System 2000) each required quite a bit of skill and were of equal importance. (Weigle, pp. 19, 20, 21, 22).

In the final analysis, after a thorough examination of the evidence, and after having construed every inference in Plaintiff's favor, the Court can only conclude that no genuine issues of material fact exist with regard to whether or not Plaintiff received treatment which was disparate from that accorded to other similarly situated employees. Therefore, since the undisputed facts indicate that Plaintiff was not treated more unfavorably than others due to her race or sex, the Court finds that Defendant is entitled to summary judgment on this point as a matter of law.

### B. *Wrongful Discharge*

◼ Plaintiff's complaint has also presented allegations that she was wrong-

fully discharged from her employment at the ASD Computing Center. In *Potter v. Goodwill Industries of Cleveland*, 518 F.2d 864 (6th Cir. 1975), the Court indicated that:

> [I]n order to make out a prima facie case of discriminatory discharge, a Title VII plaintiff must only show that he is a member of a class entitled to the protection of the Civil Rights Act, that he was discharged without valid cause, and that the employer continued to solicit applications for the vacant position.

*Id.* at 865. This initial burden has been characterized as a requirement "of showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (citation omitted). The issues before the Court then are, whether any genuine issues of material fact exist with regard to: (1) Plaintiff's membership in a protected class; (2) the validity of Plaintiff's discharge; and (3) the solicitation of non-minority applicants for Plaintiff's vacant position.

Initially, the Court notes that no dispute exists concerning Plaintiff's membership, as a black female, in a class protected by Title VII. Further, after construing every inference most positively in Plaintiff's favor, the Court has been unable to find any issues of material fact concerning the validity of Plaintiff's discharge. Although Plaintiff's work was felt to be technically satisfactory (Pitts, p. 61), that factor was not relevant to the discharge, as her termination was not premised upon poor work performance. On the contrary, Pitts listed the following reasons for Brown's discharge:

> 1) ... failure to cooperate with supervisor ... in accepting task assignments as valued training tools; 2) ... lack of positive commitment to good interpersonal relationships with co-workers; and 3) ...

unwillingness to accept ASD Computer Center Management judgment concerning needs and methods for trainee developmental experience.

[Admin.Rec. 69]

The record presented to the Court is devoid of a single inference that Plaintiff ever accepted her task assignments as valued training tools, or that Plaintiff ever indicated, despite her disagreements with management, that she would accept their decisions and not raise the issues of training or assignments again. (Brown, pp. 52, 53). Without engaging in a repetitive discussion of points previously mentioned in this Opinion, the Court notes that Plaintiff received various indications from Pitts and Weigle of the learning value of her assigned duties, and was also given a warning from Pitts on October 3, 1978, that failure to accept the value of tasks, and to demonstrate a willingness to cooperate with, and accept, management decisions could lead to termination. Plaintiff, however, continued to express the same concerns, in weekly meetings with Weigle in October, 1978, and in letters written to Weigle after he had again outlined Plaintiff's assigned duties, the extent of time required for their performance, and his opinion of the value of each task. Giving full credence to Plaintiff's assertion that she was merely seeking understanding, the Court nonetheless must conclude that Plaintiff undisputably did not evidence acceptance of management decisions over training and task assignments.

Pitts was aware that Brown continued to express the above concerns, and on November 2, 1978, informed her that because he had observed no improvement in the areas outlined in his October 3rd letter, he intended to recommend that she be separated from employment. Pitts did indicate that he would continue Brown's evaluation for another thirty days to see whether she showed improvement. On December 11, 1978, Pitts wrote Brown concerning her informal grievance of December 8, 1978, which had raised issues previously discussed in, *inter alia*, his letter of October 3, 1978.[11]

11. Again, insofar as this letter is offered to prove the truth of its contents, i. e., that Brown

made an informal grievance raising training and work assignments on December 8, 1978, it

There are no factual disputes concerning the occurrence of these events, and again, the Court can only conclude that these incidents evidenced Brown's failure to accept the value of her assigned tasks, and a failure to illustrate a willingness to cooperate with, and abide by, management's decisions regarding her duties and training.

Having observed no further improvement, and being aware, from the December 8, 1978, grievance, that Brown continued to express concerns over assignments and training, Pitts informed Brown, on December 13, 1978, that she would be terminated by ASD. Pitts listed three incidents as examples of the continuation of Brown's deficiencies as noted in the October 3, 1978, letter. After a thorough scrutiny of the evidence in the record concerning these incidents, the Court finds that there are no issues of disputed fact which are *material* to the issues under consideration. First, the facts construed most strongly in Brown's favor with regard to her assignment to develop a plan for the installation of a replacement disc system, indicate that Brown was given an extension of time by Weigle, after she had failed to start the task as he had instructed. Brown told Weigle either that she did not have time to do the task, or that she felt it was too early to begin same. Any dispute regarding which response Brown made is not material, because both replies indicate her unwillingness to accept her supervisor's judgments concerning the priority of certain tasks, and about the proper allocation of her time. Further, assuming as Plaintiff suggests, that she was not responsible for the malfunction of the ASD computer system in November, 1978, the fact is that the crux of Pitts' comment is directed not toward her culpability for that incident, but rather toward Brown's failure to accept her supervisor's guidance subsequent to the incident. This latter fact is not disputed by any evidence in the record.

Finally, the third incident referred to in Pitts' letter relates to Brown's further statements about the routine nature of her duties and attempts to satisfy her concerns. The evidence is uncontradicted that some of Brown's routine duties were assigned to the two new lieutenants, at her request. More importantly, however, this incident reveals Pitts' awareness of Brown's continued nonacceptance of management decisions. Based on the foregoing discussion, the Court concludes that there are no disputed issues of fact with regard to the validity of Plaintiff's discharge.

The final step of the analysis outlined in *Potter v. Goodwill Industries of Cleveland*, 518 F.2d 864, is a determination of whether non-minority applicants were sought for the vacant position left by plaintiff's discharge. *Id.* at 865. The undisputed facts herein indicate that Plaintiff's position was eliminated for budgetary reasons, and that her former duties were, as of October 29, 1980, being performed by Lieutenants Owens and Pinckney. (Pitts affidavit, ¶ 11; Weigle affidavit, ¶ 8). Thus, Plaintiff would not be able to establish a prima facie case even if there had been issues of material fact concerning the validity of her discharge.

Based on the preceding analysis, the Court concludes that there are no genuine issues of material fact concerning the alleged discriminatory nature of the termination of Plaintiff's employment, and that because of the failure of the undisputed facts to establish even a prima facie case under the *Potter* analysis, the Defendant is entitled to summary judgment on this point as a matter of law.

#### C. *Retaliation*

■ The third claim presented herein is that Plaintiff's discharge was retaliatory in nature and therefore unlawful under 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case where an alleged retaliatory discharge is involved, an employee must show:

(1) that he engaged in a protected activity [such as filing an E.E.O.C. charge]; (2) that the employer knew of this protected

---

is admissible under Fed.R.Evid. 803(6) as indicated in Footnote 2, *supra*. Moreover, the information is deemed relevant, as relating to the

issue of Brown's discharge, and the Court has found no indicia to infer a lack of trustworthiness.

activity; (3) that he was subsequently discharged or subjected to other damages; and (4) that the employer had a retaliatory motive or that the timing of its action was such as to allow an inference of retaliation to arise. *Sutton v. National Distillers Products Co.,* 445 F.Supp. 1319, 1325–1326 (S.D. Ohio, 1978), *aff'd* 628 F.2d 936 (6th Cir. 1980) (citations omitted). The issue thus is, whether Plaintiff has established a prima facie case of retaliatory discharge, after all inferences have been construed most strongly in her favor. In making this evaluation, however, the Court is mindful of the principle that Plaintiff must do more than merely show that she protested practices contrary to Title VII and was then subjected to adverse action by her employer. *Miller v. Williams,* 590 F.2d 317, 320 (9th Cir. 1979).

In the present case, "protected" activities of Plaintiff may have been either her threat on September 22, 1978, to file a complaint with the E.E.O. (Brown, p. 86) *Silver v. KCA, Inc.,* 586 F.2d 138, 141 n.2 (9th Cir. 1978), or her participation in at least some type of pre-complaint procedure under 29 C.F.R. § 1613.213(a). *Gonzalez v. Bolger,* 486 F.Supp. 595, 601 (D.D.C.1980). There is no question that Plaintiff's supervisors were aware of her threat to file an E.E.O. complaint, as she informed them on September 22, 1978, of her intention to do so. There is also no doubt that Plaintiff was discharged. Therefore, the prima facie case discussed above has been satisfied in three respects, at least with respect to Plaintiff's threat to file an E.E.O. complaint. There is no indication at any point in the record, however, that Plaintiff's supervisors were informed of her participation in precomplaint activity. In fact, the grievance filed on October 16, 1978, by Plaintiff contained no mention of racial or sex discrimination. (Brown, p. 58). Thus, as there are no disputed facts with regard to whether Defendant knew of Plaintiff's pre-complaint procedure, the prima facie case in that regard is not satisfied, and the Court sees no need to further address retaliation as it relates to Plaintiff's participation in a pre-complaint procedure.

The final requirement for a prima facie case is, as noted, that the employer have a retaliatory motive, or that such a motive can be inferred from the timing of the retaliatory action. In the present case, the Court finds that even after all inferences are credited in Plaintiff's favor, they do not create issues of material fact with respect to the actual or imputed existence of a retaliatory motive on the part of ASD, in relation to Plaintiff's threat to go to the E.E.O.

Addressing first the issue of retaliatory motive, the Court finds that no genuine issues of material fact exist with regard to the presence of an actual retaliatory motive on the part of the Defendant. The alleged act of retaliation would have occurred in December, 1978, when Plaintiff was notified that she would be discharged by ASD. The Court has previously concluded that no material issues of fact exist with respect to the validity of Plaintiff's discharge, and implicit in that conclusion is a determination that Plaintiff's employment was terminated for legitimate, non-discriminatory reasons. Since the discharge was premised upon valid reasons, the Court would be speculating in an unwarranted manner by concluding, based on the same undisputed facts, that Plaintiff's discharge was due even in part to retaliatory motives.

Without being unduly repetitive of points previously discussed, the Court notes that in July, Pitts prepared a formal training plan for Brown, advised her of the value of her assigned duties, and of the need to cooperate with management, and warned her that a failure to follow directions could result in employment termination. In August, Brown again met with Pitts and raised the issues which Pitts had apparently already attempted to resolve. In September, Brown further questioned her training and task assignments, with her new supervisor, Weigle, and on a separate occasion with Pitts and Colonel Fass. Pitts then informated Brown in October that her performance was deficient because, *inter alia,* she had failed to accept task assignments as valued training tools and had not accepted, or cooperated with management decisions.

Despite this letter, Brown continued to raise the issues of her training and task assignments, in weekly meetings with Weigle, and in written memoranda to Weigle, the latter, of which at least, Pitts was aware. Following these acts, which at the very least suggest that Brown did not accept management decisions, Pitts recommended on November 2, 1978, that Brown be separated, but did agree to continue her evaluation for another thirty days. Between that time and December 13, 1978, the date of Pitts' final letter to Brown, Pitts became aware that Brown had filed an informal grievance, not raising issues of racial or sex discrimination, but again addressing the value of assigned tasks and training. Faced with what appears to have been an impasse on the training and assigned duties questions, Plaintiff's employment was then terminated. Giving full credence to Plaintiff's comments in her memorandum (Doc. 55) about Colonel Fass' reaction to her threatened E.E.O. action, there is no inference in the record that the decision to terminate Brown was anything other than Pitts' determination, premised on the above impasse, that Plaintiff must be discharged. Thus, the Court concludes that there is no evidence of retaliatory motive.

As noted, where there is no direct proof of a retaliatory motive, retaliation may be imputed if the timing of the retaliatory act is such as to allow an inference of retaliation to arise. *Sutton v. National Distillers Products Co.*, 445 F.Supp. 1319, 1325–1326 (S.D. Ohio, 1978), aff'd. 628 F.2d 936 (6th Cir. 1980). While no authority has been found which specifies how close the retaliation must be to the knowledge of protected activity in order to create an inference of retaliation, several significant points should be made. First, the act generally accepted as retaliation appears to be discharge, and the time period involved has been far less than that involved herein. For example, in *McCarthy v. Cortland County Community Action Program*, 487 F.Supp. 333 (S.D.N.Y. 1980), the Court concluded that a time period of only two weeks between a press conference held by an employee challenging employment practices and that employee's discharge established a prima facie case of

retaliation. *Id.* at 340. In *Womack v. Munson*, 619 F.2d 1292 (8th Cir. 1980), the employee was suspended within five days, and fired within twenty days after the employer learned of the employee's participation in protected activity. *Id.* at 1297. Based on these facts, the Court concluded that a prima facie case of retaliation had been established. Also, in *Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025 (5th Cir. 1980), the plaintiff informed her employer that she intended to file an E.E.O. complaint the following day. Two days after that announcement she was fired. *Id.* at 1035. The Court in that case made no comment with respect to the time span involved, but merely reversed the district court's finding that the employer did not have notice of the employee's participation in protected activity. *Id.* at 1035–1036.

In the present case, Plaintiff's discharge occurred on December 13, 1978, approximately three months after her announcement (on September 19 or 22, 1978) of an intention to consult with the E.E.O., and four months after she was advised by Pitts to contact the E.E.O. Office. While this Court makes no determination of the precise time span beyond which an inference of retaliation may not be created, the period involved herein does not provide the inference necessary to establish a prima facie case of retaliation. In this regard, the Court notes that the inference of retaliation which arises through timing is not provided for in Title VII, but is merely an attempt used by Courts, most notably *Hochstadt v. Worchester Foundation for Experimental Biology, Inc.*, 425 F.Supp. 318 (D.Mass. 1976), aff'd. 545 F.2d 222 (1st Cir. 1976) (*Hochstadt*) to adapt the order and allocation of proof outlined in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to cases involving retaliation. *Hochstadt*, 425 F.Supp. at 324. This Court agrees with the utility of such an inference but would hesitate to expand its scope, particularly in a case such as the present, where there are no other indicia of retaliation. Thus, as the undisputed facts pertaining to Plaintiff's protected activity and her subsequent discharge neither estab-

lish a retaliatory motive, nor are so connected in time as to create an inference of retaliation, the evidence fails to establish a prima facie case of retaliation.

Plaintiff has additionally indicated in her memorandum (Doc. 55) that the October 3, 1978 letter of Pitts constituted a retaliatory act. Initially, the Court must state that it has substantial difficulty characterizing the October 3rd letter as a retaliatory act, in light of the preceding discussion, which indicated that discharge appears to be the most commonly recognized form of retaliatory discrimination. Viewed in its strongest context, the October letter is no more than a warning, much like the July 25, 1978, letter from Pitts to Brown, that certain aspects of Brown's performance required correction, and that a failure to do so could result in termination of her employment. While the Court recognizes that, in an appropriate case, retaliation could be premised upon documentation of fabricated employee misconduct, there is no indication of such actions herein. In this regard, the July 25, 1978, letter is particularly relevant, as that document, written prior to any knowledge of protected activity, contains essentially the same type of warning conveyed on October 3, 1978.

Moreover, even assuming that the October 3rd letter could legally constitute a retaliatory act, the Court does not find either a retaliatory motive, or an inference of retaliation through the timing of the letter. Once again, with respect to retaliatory motive, the Court notes that the October letter is part of a logical progression of events revolving around a continuing dialogue over Plaintiff's training and work assignments, beginning at least by March, 1978, and ending only with Plaintiff's discharge in December, 1978. Another factor indicating the absence of a retaliatory motive is the July 25th letter from Pitts to Brown, which as noted, clearly specified a number of problem areas, such as Brown's reluctance to perform routine tasks, and also contained a warning that a failure to follow directions could be used as a basis for termination. Although Brown did not place any credibility in this letter, it is apparent that Pitts did express dissatisfaction with Brown's performance prior to any knowledge that she had engaged in protected activity.

Next, although Pitts' October letter followed not long after Brown's announcement on September 22, 1978, that she intended to file an E.E.O. complaint, that fact alone is not material, when placed in the proper context, and does not create an inference of retaliation through its timing. First, the letter is merely a notification to Plaintiff that she *could* be subject to discharge if certain deficiencies were not improved. Second, the letter was sent during the tenth month of Brown's probationary employment, and there is nothing to contradict Pitts' statement that he was required to send such a notice by the Personnel Department. Third, because Pitts was aware of the possibility of an E.E.O. complaint as early as August, 1978, retaliation could, in terms of timing, be related to that time period as easily as to September. In fact, timing should properly be related to August, in light of the fact that, since Pitts was the person who performed the alleged retaliatory act, the date of his initial awareness is most relevant. Thus, under the standards previously cited, the period between Pitts' knowledge and the October letter is not sufficiently close to establish the requisite inference of retaliation.

Based on the above analysis, the Court finds, having construed all inferences most strongly in Plaintiff's favor, that there are no genuine issues of fact with regard to Plaintiff's discharge as a retaliation for her participation in activities protected under Title VII. On the evidence presented, with all inferences construed in her favor, Plaintiff has failed to establish even a prima facie case of retaliatory discharge, and accordingly, the Defendant is entitled to summary judgment on this point as a matter of law.

## IV. *Conclusion*

The preceding analysis of the factual matters and legal issues presented herein has indicated that there are no genuine issues of material fact with regard to whether the Government discriminated

against the Plaintiff by virtue of her race and sex, by offering her disparate training opportunities and work assignments; by discharging her; or by retaliating against her for her participation in activities protected under Title VII. Accordingly, as no inferences of discriminatory conduct on the part of the Government have been raised, summary judgment is conditionally granted to Defendant Hans M. Mark and against Plaintiff Marvinell Brown. When Defendant's counsel has complied with the order of the Court to authenticate the documents referred to in its order of June 29, 1981, in a manner as required by Rule 803(6), this conditional opinion will be made the subject of a final judgment entry in favor of the Defendant and against the Plaintiff herein. If authentication is not accomplished, within the ten (10) day period set forth above, this Court will reconsider its opinion. In addition, Plaintiff's motion to amend her complaint and for further discovery, being moot, are hereby denied.