**Dr. Roger PEELE, Acting Superintendent, St. Elizabeths Hospital, Plaintiff,**

v.

**Joseph A. CALIFANO, Secretary, Department of Health, Education and Welfare, Defendant.**

**Civ. A. No. 77–269.**

United States District Court, District of Columbia.

Jan. 19, 1978.

James D. Hill, Washington, D. C., for plaintiff.

John Oliver Birch, Asst. U. S. Atty., David H. Shapiro, Sp. Asst. U. S. Atty., Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FLANNERY, District Judge.

### I. *Introduction*

Plaintiff, a white male, is a medical doctor, a board-certified psychiatrist, and a board-certified mental health administrator. In July, 1974 he was appointed Assistant Superintendent of St. Elizabeths Hospital and he is currently serving in that post. Defendant is the Secretary of the Department of Health, Education and Welfare.

This action was brought by plaintiff pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16 (1970 & Supp. V 1975). Plaintiff claims that as a result of unlawful discrimination on the basis of race, he was denied appointment as the Superintendent of St. Elizabeths Hospital in June of 1976 and therefore, he is entitled to retroactive appointment.

On September 30, 1977, this court granted partial summary judgment for plaintiff on the question of discrimination, having found that the selection of Dr. Ulysses Watson for the position of Superintendent of St. Elizabeths in June of 1976 was tainted by considerations of Dr. Watson's race—Dr. Watson is black. The court denied cross motions for summary judgment on the question of relief. A trial *de novo* was held before this court on November 28—December 7, 1977 on the question of whether plaintiff, having been discriminated against, is entitled to an order directing his retroactive appointment as the Superintendent of St. Elizabeths. The court must determine whether, absent the racial discrimination, plaintiff would have been appointed Superintendent of St. Elizabeths. The court determined, in the grant of partial summary judgment, that the relevant issue is the status of the candidates at the time of the discriminatory decision and therefore, events subsequent to the date of decision have not been considered.

### II. *Findings of Fact*

In June of 1975 Dr. Luther Robinson, then Superintendent of St. Elizabeths, left his position for another position within the hospital. In July of 1975 Dr. Peele automatically became Acting Superintendent of St. Elizabeths when the position became vacant and he remained in that post until October 24, 1977. Dr. Peele's permanent position as Assistant Superintendent is classified as grade GS–17 and the Superintendent position is classified as grade GS–18. Plaintiff served as Acting Superintendent at grade GS–17.

St. Elizabeths is located within the District of Columbia and is operated by the United States. Organizationally, it is under the jurisdiction of the National Institute of Mental Health (NIMH), which is within the Alcohol, Drug Abuse and Mental Health Administration (ADAMHA) of the Department of Health, Education and Welfare (HEW). St. Elizabeths is currently mandated to provide residential psychiatric care for certain federal beneficiaries and residents of the District of Columbia.

The position of Superintendent of St. Elizabeths Hospital is unique in that St. Elizabeths is the only psychiatric hospital within HEW. Although there are other GS–18 positions in HEW, none have the unique stature, authority, or responsibility of the position of Superintendent of St. Elizabeths. There is no equivalent position in HEW.

In the fall of 1975, Dr. Betram S. Brown, the selecting official who was the Director of NIMH, decided to fill the Superintendent's position by conducting a nationwide search for candidates. A search plan was submitted to the Civil Service Commission (CSC) and the plan was ultimately approved on January 6, 1976. In December of 1975 the agency circulated announcements and newspaper advertisements soliciting appli-

cations for the position. As part of the plan the CSC directed NIMH to develop rating criteria for a Qualifications Review Board (QRB) which would screen the candidates. Mr. James Pittman, the Executive Officer of NIMH, developed the criteria to be used by the QRB in determining the basic eligibility of the candidates. It was not intended that the criteria developed for the QRB would include every factor that the selecting official might ultimately consider. This procedure was proper and appropriate under the CSC guidelines then in effect.

Of the ten applications received for the position, four were transmitted to the QRB for rating. The four applications referred to the panel were those of Drs. Peele, Watson, Meredith, and Simor. The QRB was composed of: Thomas F. A. Plaut, Ph.D., Assistant to the Director, NIMH; Dr. Francis N. Waldrop, Deputy Administrator, ADAMHA; and Dr. Jefferson McAlpine, Administrator, Mental Health Administration, Department of Human Resources of the District of Columbia. The QRB met on March 25, 1976 and the three members of the Board evaluated the qualifications of the candidates, their curriculum vitae, and their Standard Form 171 applications. Dr. Simor withdrew his application immediately thereafter and the three remaining candidates were certified to the selecting official as highly qualified. The composition and operation of the QRB were proper under CSC procedures then in effect. Under the procedures then approved by the CSC, the selecting official was free to choose any one of the three candidates as the new Superintendent.

In the Spring of 1976, Dr. Brown invited various professional and community groups in the District of Columbia area to participate in the selection process. These groups were the Medical Society of St. Elizabeths, the Department of Human Resources of the District of Columbia, the Washington Psychiatric Society, the D.C. Mental Health Association and the Medical Society of the District of Columbia. He requested that these groups interview the candidates or review their qualifications and report to

him on their evaluations. Dr. Brown took this action in order to: (1) ensure meaningful participation by the groups that would work closely with the new Superintendent; and (2) determine whether any of the candidates were unacceptable to any of the groups. The second issue was significant to Dr. Brown because he considered those groups to have a potential veto power over the candidates. All of the groups found the candidates highly qualified for the position and none of the groups found any of the candidates to be unacceptable. Specifically, of the five groups, three recommended Dr. Peele and two recommended Dr. Meredith.

In addition to seeking the views of the five community groups, Dr. Brown had four officials from within the agencies of HEW interview the candidates and make evaluations and recommendations. These officials were Dr. Plaut, Dr. Waldrop, Mr. Pittman and Dr. Joseph Gallagher, Dr. Brown's top assistant for St. Elizabeths' affairs.

After conducting interviews pursuant to Dr. Brown's request, Dr. Plaut told Dr. Brown that he preferred either of the outsiders, Dr. Meredith or Dr. Watson, to Dr. Peele. Although Dr. Plaut thought Dr. Peele was highly intelligent and extremely conscientious, he based his opinion on Dr. Peele's link to the St. Elizabeths' system, his orientation towards the problems facing the hospital, his view of the role of the courts in the areas of mental health and patients' rights, and his leadership qualities in relation to the other candidates. As was his custom as a close confidential advisor to Dr. Brown, Dr. Plaut communicated these views to Dr. Brown orally.

After conducting interviews, Dr. Waldrop told Dr. Brown in a separate memorandum on each candidate that all were well qualified. Although Dr. Waldrop did not recommend the appointment of any specific candidate, he did provide Dr. Brown with an analysis of the strengths and weaknesses of each candidate. Dr. Waldrop was impressed with both Drs. Watson and Meredith, but seemed more impressed with Dr. Watson because of his broad range of expe-

rience. As to Dr. Peele, Dr. Waldrop noted that his experience was exclusively at St. Elizabeths, he had limited research administration experience, and he did not have the same degree of administrative experience over an entire institution as the other candidates.

Dr. Gallagher only interviewed Drs. Watson and Peele. After interviewing these candidates, Dr. Gallagher recommended Dr. Peele rather than Dr. Watson because he believed that their working relationship, though not satisfactory, was improving and should continue rather than his having to begin a new relationship with Dr. Watson. Although Dr. Gallagher told Dr. Brown that Dr. Watson would make a better Superintendent than Dr. Peele, he indicated that he preferred to continue with Dr. Peele because of the severe and immediate problems then confronting the hospital. As Dr. Gallagher put it, he did not want "to change horses midstream". As a confidential assistant to Dr. Brown, Dr. Gallagher communicated his views to Dr. Brown orally.

Mr. Pittman also interviewed the candidates and communicated his views to Dr. Brown orally. Mr. Pittman had received reports criticizing Dr. Peele's leadership, particularly in the areas of personnel and budget management. Although Mr. Pittman did not specifically recommend any of the three candidates, he did tell Dr. Brown that it was his considered opinion that the Superintendent needed to be an outsider—someone who could bring fresh ideas and insight to the troubled hospital. Mr. Pittman, therefore, told Dr. Brown that only Dr. Watson and Dr. Meredith were well qualified for the position. He also was impressed with Dr. Watson's and Dr. Meredith's administrative abilities and their records in running hospitals.

Dr. Brown interviewed all of the candidates himself before making a selection. The selection was not made until after Dr. Brown had the benefit of all the recommendations from the NIMH officials and the community groups. Additionally, as recommended by Dr. Waldrop in his memoranda on Drs. Watson and Meredith, Dr. Brown checked the two outside candidates by contacting their supervisors, as well as others, in their home states of Colorado and Pennsylvania, respectively. All those contacted praised the candidate they knew.

In considering the candidates, Dr. Brown determined what administrative and professional characteristics the next Superintendent would need in order to deal with the major problems confronting St. Elizabeths and which of these characteristics each candidate possessed. This determination took Dr. Brown beyond the scope of the qualifications requirements used in the announcement of the position and by the QRB. This was proper for the selecting official and sanctioned by the CSC, particularly in high level executive appointments such as the superintendency of St. Elizabeths.

Dr. Brown considered all of the candidates to be qualified. In light of the magnitude of the problems at St. Elizabeths, however, Dr. Brown was convinced that the hospital needed a new face in the Superintendent's office. In Dr. Brown's view, an "outsider," someone unconnected to the hospital, would best bring about the changes needed in this troubled institution. The hospital was in desperate need of drastic change and, in Dr. Brown's view, only a newcomer to St. Elizabeths could, by force of personality and proven administrative leadership, lead the hospital out of the quagmire in which it was entrenched. Seeking a qualified outsider, who in the opinion of the selecting official would be better able to solve the problems and reverse the decline of the troubled institution, was a legitimate consideration in the selection process.

Dr. Peele has spent his entire professional life at St. Elizabeths. Dr. Brown stated, however, that had Dr. Peele's performance as Acting Superintendent and Assistant Superintendent been outstanding, it might nevertheless have overcome his strong predilection towards the selection of an outsider. Dr. Brown's view was that Dr. Peele's performance, though acceptable was by no means outstanding and therefore, was in-

sufficient to overcome his insider status. In contrast, Drs. Watson and Meredith were both outsiders with outstanding records in the operation of major mental hospitals.

In addition to desiring an outsider, Dr. Brown wanted a Superintendent who would not merely dutifully carry out the policies of NIMH, ADAMHA, and HEW, but who would also enthusiastically endorse those policies and implement them with appropriate sincerity and vigor. In this regard, Dr. Brown considered his long standing differences with Dr. Peele on such issues as transfer of the hospital to the government of the District of Columbia, the need to improve more than just the physical plant at St. Elizabeths in order to be reaccredited by the Joint Commission of Accreditation of Hospitals, the role and type of research at St. Elizabeths, and the need to transfer patients from an institutional to an out-patient setting.

Further, Dr. Brown believed he was spending a disproportionate amount of his time working on problems associated with St. Elizabeths. He decided that the new Superintendent would have to be a person with the personality, leadership ability and political acumen to take charge of the hospital's affairs and represent the hospital before Congress, the District of Columbia government, and the upper levels of HEW without disproportionate assistance from NIMH. Again, Dr. Brown did not believe the plaintiff could provide the necessary dynamic personality, political acumen, or administrative expertise to handle this enormous task. Just as the selecting official's opinion that an outsider was needed was an appropriate factor to consider, it also was proper for the official to consider personality traits and policy differences in selecting a Superintendent for the hospital. This was confirmed by the CSC executive personnel expert who testified at trial.

Dr. Peele was not selected as the Superintendent of St. Elizabeths more because of the need for an outsider than because of his own shortcomings. It is readily apparent that the plaintiff has been devoted and dedicated to St. Elizabeths and that he

made many improvements to the hospital during his eleven-month term as Acting Superintendent. Dr. Brown, the NIMH staff, the hospital staff, and this court are of the opinion that Dr. Peele is an eminently qualified individual. In fact, Dr. Brown stated that he believed that all of the candidates were well-qualified and that any one of them would be an appropriate choice. The issue, however, is not whether Dr. Peele was qualified, but whether Dr. Peele would have received the appointment absent racial discrimination.

Dr. Brown viewed what he perceived as Dr. Peele's deficiencies in relation to his opinion of the strengths of the other two candidates. In this regard, Dr. Brown testified that he believed Dr. Ulysses Watson to be a talented administrator and psychiatrist who was well informed and articulate. Dr. Brown stated that he was confident that Dr. Watson would be a strong and innovative leader. Further, Dr. Brown also testified that he believed that Dr. Watson had the capacity to immediately understand the problems of the hospital and that he would be able to bring to bear his considerable knowledge, gleaned from his vast experience, to the aid of St. Elizabeths. Dr. Watson's experience included leadership of a state mental hospital, a forensic institution, and a medical unit of a mental hospital. Dr. Watson also had a private psychiatric practice and was a consultant to a court psychiatric clinic. Dr. Watson received favorable recommendations from his supervisors in Pennsylvania and the NIMH senior staff. As a result of his conversations with Dr. Watson, Dr. Brown stated that he became convinced that Dr. Watson was in complete agreement with NIMH's perceptions concerning the role and need for research at the hospital and that he fully supported a movement toward out-patient community care for the mentally ill. In short, Dr. Brown testified that he reached the conclusion that Dr. Watson would be an outstanding leader for St. Elizabeths who would inspire the staff and vigorously attack the hospital's many problems in an incisive and innovative style fostered by his proven administrative abili-

ty. Dr. Brown also stated that he believed that Dr. Watson would fully support the policies of NIMH, ADAMHA, and HEW with the necessary thoughtfulness and vigor. It should also be noted, however, that in its grant of summary judgment for the plaintiff on the issue of racial discrimination, this court found that the selecting official improperly considered race as a factor in his initial selection of Dr. Watson.

As to the other candidate, Dr. Brown was very favorably impressed by Dr. Meredith. Dr. Brown found that Dr. Meredith had a broad and diverse range of experience in both public psychiatry and mental hospital administration. Dr. Meredith, in Dr. Brown's view, was a strong and inspiring leader who had demonstrated his commitment to out-patient community care in his innovative management of a large state hospital in Colorado. Dr. Brown's view was confirmed by Dr. Meredith's supervisors in the state of Colorado. Dr. Brown found that Dr. Meredith, like Dr. Watson, was strongly committed to aggressive and well-balanced research at St. Elizabeths. Dr. Brown also was impressed by Dr. Meredith's innovative ideas for dealing with the problems of the hospital including those involving accreditation. Dr. Brown saw Dr. Meredith as a talented, articulate, and experienced psychiatrist and mental health administrator of proven ability who could bring strong leadership to St. Elizabeths. Dr. Brown believed Dr. Meredith was willing to support the policies of NIMH, ADAMHA, and HEW and those organizations' goals for the hospital. Dr. Brown's views were confirmed not only by Dr. Meredith's supervisors in Colorado, but also by the views of the senior staff at NIMH who interviewed him.[1]

The court recognizes that a selection process of this type involves many decisions over the course of a considerable amount of time. It seems apparent, however, that Dr. Brown made his selection of Dr. Watson sometime on the 10th of June, 1976, after all recommendations regarding the candidates were received and considered. It is apparent from the testimony of both Dr. Brown and Dr. Plaut that Dr. Brown considered, at the same time he selected Dr. Watson, a second choice in case there was any problems with the Watson appointment. This also was done on June 10, 1976. Dr. Plaut and Dr. Brown recognized the need for a second choice because of a series of problems in the selection of high level officials mainly due to the competition for professionals of high competence. At the time Dr. Brown selected Dr. Watson for the superintendency, Dr. Meredith was his second choice. The decision to select Dr. Meredith as a second choice was entirely consistent with the advice Dr. Brown had received from within NIMH and ADAMHA as well as from the community groups.

The evidence does not indicate that Dr. Watson would have been Dr. Brown's choice as Superintendent if his race had not been considered. Although Dr. Brown stated that he would have chosen Dr. Watson even if he had been white, this court is of the opinion that race was the predominant factor in his selection, and that the alleged reasons for Dr. Watson's appointment asserted by the defendant were merely a pretext for discrimination. It is apparent, however, that if Dr. Watson had not been selected, Dr. Brown would have chosen Dr. Meredith on the 10th of June, 1976. Thus, Dr. Peele would not have been selected as the new Superintendent even if Dr. Watson's race had not been a factor in Dr. Brown's decision. The government has carried its burden of proof by presenting clear and convincing evidence that Dr. Peele would not have received the appointment even if there had been no discrimination. In sustaining his burden, the defendant proved by clear and convincing evidence that but for the discrimination, Dr. Meredith, not Dr. Peele, would have received the appointment. The defendant did not prove by clear and convincing evidence that Dr. Watson still would have received the appointment but for the racial discrimination.

---

1. In fact, Dr. Meredith was offered the position of Superintendent of St. Elizabeths in 1968, but he did not accept the appointment.

Plaintiff's evidence supported a finding that Dr. Peele was a highly qualified candidate. This fact, however, was fully recognized by Dr. Brown and was never contested by the defendant. The plaintiff also proved he had the support of the senior staff at St. Elizabeths. Dr. Brown logically expected this to be the case, however, and stated that he would have been shocked if it were not so. Significantly, plaintiff offered no evidence inconsistent with Dr. Brown's testimony and that of the other NIMH officials that Dr. Peele's status as an insider, his policy disagreements with NIMH and Dr. Brown, and his lack of broad administrative experience rendered his impressive qualifications inferior, in the selecting official's opinion, to those of Dr. Meredith. The majority of the testimonial evidence offered by the plaintiff was not probative of the relative qualifications of the candidates. Members of the senior staff of the hospital who testified admittedly did not know the qualifications of either Dr. Meredith or Dr. Watson and thus did not, and could not, compare them to Dr. Peele. Dr. Peele also agreed that Dr. Meredith was qualified and worthy of being on the highly qualified list.

The plaintiff did offer the testimony of representatives of the outside groups asked to review the qualifications of the candidates by Dr. Brown. These witnesses, however, saw all of the candidates they interviewed as being fully qualified and did not state to Dr. Brown that any of the candidates would be unacceptable. In fact, two of the groups recommended Dr. Meredith. Although three groups recommended Dr. Peele for the superintendency to Dr. Brown, Dr. Brown reasonably expected this result. In Dr. Brown's mind, the critical factor in the recommendations was that none of the groups vetoed any of the three candidates.

Dr. Brown did state to senior staff at St. Elizabeths that lack of ability on the part of Dr. Peele did not cause the selection of Dr.

Watson. These statements were reasonable under the circumstances and were not inconsistent with Dr. Brown's testimony concerning his opinion on the need for an outsider and the relatively superior qualities of Drs. Watson and Meredith. Dr. Brown's statements to Dr. Peele concerning Dr. Watson's selection also are consistent with his testimony. The court recognizes the fact that Dr. Peele was still to serve as Assistant Superintendent. In Dr. Brown's view, which was entirely reasonable, nothing could be gained by disparaging Dr. Peele, particularly because Dr. Peele, Dr. Watson, Dr. Brown, and the senior staff would have to work together after the selection. Thus, Dr. Brown spoke of Dr. Watson's strong points to both plaintiff and the senior staff.

## III. Conclusions of Law

■ This court has jurisdiction over the matter pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16(c) (1970 & Supp. V 1975). Section 2000e–16 is the exclusive remedy for federal employees complaining of employment discrimination. *Brown v. GSA,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). Once discrimination has been found, as it has in this case by partial summary judgment for the plaintiff, *see Peele v. Califano,* No. 77–269 (D.D.C. September 30, 1977) the question of relief is governed by *Day v. Mathews,* 174 U.S.App. D.C. 231, 530 F.2d 1083 (1976).

Whether or not a victim of employment discrimination may receive back pay and retroactive appointment is determined by applying the "but for" test. The United States Court of Appeals for the District of Columbia Circuit articulated the test by interpreting 42 U.S.C. § 2000e–5(g) (Supp. V 1975) [2] as follows:

The statute [42 U.S.C. § 2000e–5(g)] makes it clear that these forms of relief [retroactive promotion and back pay] are

**2.** 42 U.S.C. § 2000e–5(g), which was made applicable to suits by federal employees by 42 U.S.C. § 2000e–16(d), states that "[n]o order of the court shall require . . . promotion of

an individual as an employee . . . if such individual was refused . . . advancement . . . for any reason other than discrimination . . . ."

available only where the employee would have received the promotion had he not been the victim of discrimination.

*Day v. Mathews, supra,* 174 U.S.App.D.C. at 233, 530 F.2d at 1085 (footnote omitted). The court further held that the employer "bears the burden of proof on this issue . . . he must prove by clear and convincing evidence that [the plaintiff's] qualifications were such that he would not in any event have been selected." 174 U.S. App.D.C. at 233, 530 F.2d at 1085.

█ The application and review process in this case was correct and proper and Dr. Brown was free to select any one of the three candidates certified by the QRB as highly qualified. The court also has found that Dr. Brown's consideration of the need for an outsider and his analysis of the policy views, leadership styles, personalities, and past records of the candidates were entirely proper under the circumstances and were considered so by the CSC. Using a proper process of selection, Dr. Brown ranked the candidates in his own mind at the time of his selection in the following order: Watson, Meredith, Peele. Therefore, assuming that Dr. Watson would not have been the selectee but for his race, Dr. Brown would have selected Dr. Meredith, a white, rather than Dr. Peele, the white plaintiff. Defendant has met his burden of showing by clear and convincing evidence that even but for discrimination, plaintiff would not have been selected for the position of Superintendent of St. Elizabeths. Plaintiff's evidence did not establish that the nondiscriminatory reasons articulated by Dr. Brown for plaintiff's failure to obtain the position were in fact a pretext for racial discrimination. Plaintiff established that the reasons were a pretext as to Dr. Watson, but he did not do so as to Dr. Meredith who also was white.

Thus, the court cannot award to plaintiff, as part of the relief due him as a prevailing party under Title VII, either a retroactive appointment to the superintendency or commensurate back pay and benefits. *See Day v. Mathews,* 174 U.S.App.D.C. 231, 233, 530 F.2d 1083, 1085 (1976); *Rogers v.*

*EEOC,* 179 U.S.App.D.C. 270, 271, 551 F.2d 456, 457 (1977).