Milagros CARDONA, Plaintiff,

v.

Samuel K. SKINNER, Secretary
Department of Transportation,
Defendant.

Civ. No. 89–0347 (JP).

United States District Court,
D. Puerto Rico.

Jan. 23, 1990.

Gabriel Peñagarícano, San Juan, P.R.,
for plaintiff.

Fidel A. Sevillano del Río, Asst. U.S.
Atty., Hato Rey, for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

This is a civil rights action brought pursuant to Title VII of the Civil Rights Act of 1964, specifically 42 U.S.C. § 2000e–16(a).[1]

---

1. 42 U.S.C. § 2000e–16(a) provides in pertinent part:

Plaintiff Milagros Cardona ("Cardona") is a black Puerto Rican female citizen of the United States, who alleges that she was demoted in her employment with the Federal Aviation Administration (FAA). According to plaintiff, her demotion was a result of a discriminatory and disparate treatment initiated and perpetuated by key FAA personnel against her, solely on the basis of her race and national origin. After pursuing the required administrative procedures, which ended adversely for plaintiff, she now requests reinstatement with back pay pursuant to 42 U.S.C. §§ 2000e–16(d) and 2000e–5(g).[2]

It is well settled that employees in the federal government as well as employees in the private sector have the same right to a trial de novo in federal court when an adverse decision is rendered on the merits of their administrative complaints. *Chandler v. Roudebush*, 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976).

The requisite Initial and Pretrial Conferences were held and the case came to be tried by the Court on December 12, 1989, lasting over a period of five days thereafter. Based on the evidence submitted by the parties and after due deliberation, this Court now makes the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. Plaintiff Cardona was first employed by the FAA's San Juan office in 1967. She held without interruption, several clerical and secretarial positions until 1969. Plaintiff's performance evaluations and commendations received during those years demonstrate that she was an efficient, effective and dedicated public servant.

2. In 1979, Cardona applied for and was selected to fill the position of Flight Data Monitor at the FAA's San Juan Air Route Traffic Control Center, as a Grade GS–5, Step 5. Cardona's selection for this position became effective on November 22, 1979. On July 30, 1980, after becoming fully qualified as a Flight Data Monitor, Cardona was promoted to Grade GS–7, Step 1.

3. On April 4, 1983, the title for the Flight Data Monitor position was changed to Air Traffic Assistant (ATA) and Cardona was reassigned accordingly. However, this was merely a title change because as an ATA, plaintiff's duties, responsibilities, and pay grade remained the same. By this time, Cardona had advanced to a GS–7, Step 3.

4. During the next year, Cardona's progression was uneventful. Plaintiff earned a within-grade increase in salary, placing her at a Grade GS–7, Step 4. Throughout Cardona's tenure as a Flight Data Monitor/Air Traffic Assistant, her performance had been evaluated as exceeding the requirements of the position, and her work was found to be fully acceptable. During the course of these years plaintiff received several commendations for the exceptional manner in which she carried out her duties.

5. The duties of an ATA require responsibility in the performance of any of the following three positions related to air traffic control: a) Flight Data, b) Clearance Delivery, and c) "A" Side. The air traffic control facility (facility) provides the required training for all these positions, through a combination of classroom and on-the-job training (OJT) instruction. This training is performed by the most qualified personnel in the position for which the ATA is being trained. Eventually, Cardona was appointed as an ATA instructor on August 23, 1983.

6. ATAs are subjected to bi-annual over-the-shoulder (OTS) evaluations as part of their job performance tests. During these tests, a supervisor with a headset stands behind the ATA while he or she is working. The supervisor attaches the

---

All personnel actions affecting employees or applicants for employment … in executive agencies as defined in section 102 of Title 5 … shall be made free from any discrimination based on race, color, religion, sex, or national origin.

2. 42 U.S.C. § 2000e–16(d) adopts the provisions of 42 U.S.C. 2000e–5(f) through (k) and makes them applicable to suits arising under 42 U.S.C. § 2000e–16(a).

headset to the ATA's console and monitors the ATA's performance. If the ATA is deemed to be performing inadequately, he or she may be decertified in that particular position. An ATA's decertification lasts until retraining for recertification is accomplished. Decertification may also occur due to an ATA's absence for an extended period of time.

7. Retraining for recertification in any of the three ATA positions is only required for that particular position in which the decertification occurred and is not required for the remaining non-decertified positions. For example, if the decertification occurs in Flight Data, the ATA remains certified in the Clearance Delivery and "A" Side positions, and does not need to take remedial training in the two latter positions.

8. In 1983, James Tucker ("Tucker") was reassigned from the continental United States to the San Juan facility as a Training Specialist and Air Traffic Controller (ATC). In January 1984, Tucker was promoted to the position of Team/Area Supervisor and was reassigned from the FAA San Juan Center's Training Department to lead one of the Air Traffic Control teams at the facility. Prior to this promotion, Tucker had very little supervisory experience. As a Team/Area Supervisor, Tucker directed a crew composed of Air Traffic Controllers (ATC) and ATAs. Cardona was a member of this crew and was also fully certified in all three ATA positions. Cardona instructed other ATCs and ATAs in those areas in which she had experience.

9. Shortly after Tucker became Cardona's supervisor, she began to be exposed to Tucker's racial and ethnic slurs. Initially, Tucker's comments were not directed specifically at plaintiff, but they were made in her presence. For example, Tucker expressed his disdain against Puerto Ricans by categorizing them as "dumb" and "stupid." He further stated it was his "dream" to supervise a traffic control room "free of Puerto Ricans."

10. Tucker's comments were made to members of a group of co-workers who shared his racial and ethnic biases, namely: Amy Pruhe, Paul Pruhe, Don Wilson, Mark Allen, Keith Kruse, and Preston Robertson. These individuals demeaned and ridiculed Cardona in her presence by commenting on her body odor and their inability to see her in the rest area of the control room, which is dark, due to the color of her skin. Tucker further manifested his racially and ethnically motivated animus against Cardona by making demeaning remarks about Cardona's daughter because she was dating a white male. Tucker and Robertson also commented that Cardona's marital relations were limited to those days on which she was given her salary.

11. Against this factual background, Tucker began to beleaguer Cardona by subjecting her to continuous OTS monitoring, by creating subjective and vague performance standards, which were designed to erode her self-confidence, and by disturbing her normal working environment, to such an extent as to cause her decertification.

12. In July of 1984, Tucker decertified Cardona in the Clearance Delivery (CD) position alleging that she was "slow, lacking in knowledge and continuity." During cross-examination, Tucker admitted that this criticism was purely subjective. No objective criteria was used, because the FAA had no procedural standards by which Tucker's demands on Cardona could be evaluated. Tucker's evaluation procedures of Cardona were designed to injure Cardona. They were not part of FAA regulations and were invented by him. During trial, Tucker was not able to identify the FAA manual containing the alleged specific training to which he subjected plaintiff, nor did he explain why plaintiff was required to receive training in all ATA positions, when Cardona had only been decertified in one. Furthermore, Tucker was unable to demonstrate why Cardona's 1980 decertification still appeared in her 1989 personnel records, even though FAA regulations request the removal of the decertification.

13. Notwithstanding the fact that she had only been decertified in the CD position, Tucker ordered that Cardona be retrained in all of three ATA positions, regardless of the fact that she remained cer-

tified in the remaining two. When Cardona was decertified in the CD position, because of Tucker's OTS evaluation, she had only been scheduled by him to work CD for 47 hours in six months, while her peers had each been scheduled for an average of 450 hours during the same time period. The FAA's Equal Employment Opportunity (EEO) Counselor, Pedro Valázquez, testified during trial that no ATA could reasonably be expected to maintain proficiency at the CD position if only allowed 47 hours of exposure during a six-month period.

14. In October of 1984, Cardona was recertified by Victor Garcia, a supervisor at the FAA, following her retraining in the CD position. Garcia had been with the FAA since 1969, and has been an ATC, Control Tower Supervisor, and is currently an Area Supervisor at the facility. At the time of Cardona's recertification, Tucker was away from Puerto Rico. However, upon Tucker's return, and his learning of Cardona's recertification, he proceeded to decertify her again. The pre-textual grounds for this decertification arose while Tucker was listening to a taped session where an alleged air traffic control deviation had been recorded. While listening to the taped session, he came across Cardona's performance, which was totally unrelated to the deviation which prompted him to hear the tape. Subsequently, on January 3, 1985, during the taped session, Tucker decertified Cardona in the Flight Data and "A" Side positions. Upon learning of the renewed decertification during trial, Garcia was surprised. The renewed decertification occurred shortly after he had found her performance fully satisfactory during the recertification process.

15. Once Tucker decertified Cardona in the Flight Data and "A" Side positions, he ordered Cardona's retraining to be provided by instructors such as Pruhe, Robertson and Wilson, all of whom were known to share Tucker's racial and ethnic biases.

16. Cardona was subsequently recommended by Instructor Fernando López on February 5, 1985, for recertification. On two different occasions Mr. José Joga, an ATA, also recommended plaintiff for a "check-out" for recertification on the Flight Data position. The EEO Counselor, Pedro Velázquez' Report evidences that plaintiff received at least ten recommendations for recertification. *See* Defendant's Exhibit J. However, Tucker did not provide an opportunity for Cardona to be recertified. During trial, Velázquez testified that it was inappropriate to have Cardona retrained by Pruhe, Wilson, and Robertson.

17. In late January, 1985, Tucker was transferred out of Puerto Rico, and Robertson was temporarily assigned as Tucker's successor, thereby becoming Cardona's immediate supervisor. At the time of his assignment, Robertson had less seniority than the majority of the controllers in the facility and had no previous supervisory experience. Robertson also shared Tucker's animus against Cardona. Robertson started working for the FAA in 1982, and before coming to San Juan, Puerto Rico in 1983, he had no experience as an FAA air traffic controller. In fact, Robertson received his ATC training at the San Juan facility, and Cardona was one of his instructors.

18. On March 10, 1985, Cardona filed an administrative complaint of discrimination with the FAA's Equal Employment Opportunity (EEO) counselor, Pedro J. Velázquez. Cardona alleged that she was a victim of current as well as previous disparate treatment from Tucker, Robertson, Marvel Kruse, Alfred Gerbs, and James Stephenson, all FAA officials.

19. On May 1, 1985, this complaint was administratively resolved and Cardona was guaranteed that she would be given 140 hours of training: 60 hours in Flight Data, 40 in "A" Side and 40 in CD. Despite these assurances, Robertson allowed only 23 hours and 17 minutes of training in CD (the position to which she had been afforded the least exposure), and removed her from training. This removal was based on purely subjective and wholly unsubstantiated reasons. Cardona was never allowed to finish the hours that had been guaranteed to her in CD, nor the 100 hours in the other two positions.

20. During this incomplete recertification process, Cardona was once again assigned Wilson and Pruhe as trainers, despite their racial and ethnic animosity for Puerto Ricans, particularly Cardona. After receiving OJT for a fraction of the time allotted for her in the CD position, plaintiff requested from the San Juan Center Manager, James Stephenson, reassignment to a different crew. This request was denied, allegedly because she had few training hours remaining. In fact, Cardona had over 115 hours of training time left. On May 18, 1985, without being allowed the guaranteed training and without being given an opportunity for recertification, Cardona was temporarily assigned to a secretarial position.

21. On June 25, 1985, plaintiff filed a second administrative complaint of discrimination, which was assigned again for investigation to Pedro Velázquez. The FAA supervisors, Marvel Kruse and James Tucker, who were interviewed by Velázquez, did not cooperate in his investigation. Kruse was an Area Manager from 1981 to 1983 at the facility and one of Cardona's supervisors. During trial Kruse testified as to the circumstances surrounding plaintiff's second decertification. Kruse's testimony during trial did not warrant the Court's credibility. Kruse testified that he had been married five times. His last marriage was to his son's ex-wife. Velázquez testified that he was reassigned during the course of the investigation and that during his 16–year experience as an EEO counselor, he had never been reassigned from an ongoing investigation surrounding alleged unlawful employment discriminatory practices. Notwithstanding his removal from the ongoing investigation Velázquez had already concluded that Cardona's supervisors' stated reasons for her decertification were unsubstantiated, based on his interviews of all ATCs and ATAs with whom plaintiff worked.

22. Velázquez, as the FAA's EEO counselor, interviewed all of Cardona's peers in the control room and ascertained that no one had voiced any complaints or misgivings about plaintiff's performance. This finding directly contradicts Tucker's and Robertson's contention that Cardona's decertification was caused by reports they received from control room personnel, whose names they refused to disclose to the EEO counselor.

23. Herbert Finn, who was with the FAA since 1963 and trained at .ε st 500 ATAs in the area of proficiency eva.. ` ion, knew Cardona since 1983 when he arrived in San Juan, Puerto Rico from Boston, Massachusetts. Finn testified that Cardona trained him on Clearance Delivery, Flight Data, and other aspects related to air traffic control. Although Finn was a qualified ATC when he arrived in San Juan, he received training from Cardona since this was the standard operating procedure for incoming new personnel. As part of his job responsibilities at the San Juan facility, Finn also evaluated Cardona's job performance and found that it was acceptable. Finn also testified as to Tucker's and Alfred Gerbs' animosity against Puerto Ricans in general and Cardona in particular. Finn testified that he often overheard Tucker's deprecative remarks against Puerto Ricans. Alfred Gerbs was one of Cardona's supervisors at the facility.

24. Plaintiff Cardona's job performance was also found to be adequate by Jerry Cheatham. Cheatham was the facility's Area Manager from September 1984 to January 1988. He found plaintiff to be knowledgeable, cooperative, and helpful. Furthermore, as Area Manager, Cheatham never received complaints from anyone concerning Cardona's performance. Cheatham also testified as to Tucker's disparaging remarks about Puerto Ricans, which he characterized as a "lack of tolerance and animosity." According to Cheatham, Robertson's supervisory experience was limited.

25. On July 1, 1985, Robertson issued Cardona a notice conveying his proposal to permanently demote her to the secretarial position she had been given on May 18, 1985. This demotion was a result of plaintiff's alleged "unsatisfactory performance." In a letter dated August 26, 1985, Robertson demoted Cardona to the position of Secretary Stenographer at a pay Grade

of GS–5, Step 10. The effective date of this demotion was September 15, 1985.

26. At the time of plaintiff's demotion, she was earning $24,508.00, including cost of living allowance, shift and night differentials, overtime, and holiday pay. These benefits accounted for a twenty-five percent increase over her basic salary. The position which she was demoted to provided for a salary of $20,581.00, including cost of living allowance; however, she was not able to earn the benefits of shift and night differentials, overtime, and holiday pay.

27. Plaintiff's normal progression and within-grade increases would have currently placed her at a Grade GS–7, Step 6. At present Cardona's salary, including cost of living allowance, is $22,509.00. However, but for defendants racially and ethnically discriminatory actions, she would have been earning $28,429.00. *See* Plaintiff's Exhibit 9.

28. Plaintiff Cardona was discriminated against by defendant, acting through its supervisors at the San Juan facility of the FAA, as the result of continuous, pervasive racially and ethnically motivated reasons. Plaintiff's witnesses, Joseph Anderson, an ATC and Fernándo López, an ATA, both trained Cardona. Anderson and López, both credible witnesses, testified that Tucker and Robertson were biased against blacks and Puerto Ricans, that such bias was present in the workplace, and that it was specifically directed towards Cardona. López testified that Tucker frequently expressed his racial and ethnic bigotry to Robertson, Allen, Wilson, and Pruhe, stating that Cardona was "dirty, smelled, and wondered how anybody could get close and make love to her." Such disparate treatment continued for a substantial period of time. Therefore, the Court finds that the FAA has violated the provisions of 42 U.S.C. 2000e–16(a) in that it discriminated against plaintiff by demoting her from the position of Air Traffic Assistant, Grade GS–7, Step 5, to that of Secretary, Grade GS–5, Step 10.

29. The FAA discriminated against plaintiff because of her race (black) and national origin (Puerto Rican). Defendant did not overcome its burden of establishing a work-related justification for plaintiff's unlawful demotion.

30. Robertson acted outside the scope of his authority as Team Supervisor while proposing to demote plaintiff and later demoting her. Robertson's authority was limited to minor disciplinary measures, such as warnings and reprimands, and he could only recommend actions in more serious cases.

31. The Court finds that the testimony of plaintiff's witnesses warrants full credibility and supports plaintiff's claim of racial and ethnic discrimination. Furthermore, the Court finds that defendant's witnesses lacked credibility and truthfulness as evidenced from their demeanors.

## II. CONCLUSIONS OF LAW

The issue in a Title VII lawsuit is whether the defendant has intentionally discriminated against the plaintiff. The Court must determine whether the employer is treating " 'some people less favorably than others because of their *race, color,* religion, sex or *national origin.*' " *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (quoting *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

■ As a federal employee, Cardona is afforded the full rights available for employees in the private sector under Title VII of the Civil Rights Act of 1964. *Brown v. ASD Computing Center,* 519 F.Supp. 1096 (D.Ohio 1981).

In order to prevail in the instant disparate treatment action brought under 42 U.S.C. § 2000e–16(a), plaintiff must prove intentional race and national origin discrimination by direct evidence or by establishing certain elements which support an inference of discrimination. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 107 (1st Cir.1988). The elements to establish an inference of discrimination within the rubric of indirect proof, were first established in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In *McDonnell Douglas*, the plaintiff brought suit under Title VII, alleging that his employer refused to rehire him after a layoff because of his race. The Supreme Court ruled that plaintiff could establish a *prima facie* case of discrimination by proving:

> (i) that he belongs to a racial minority; (ii) that he applied for and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Once the plaintiff has proven a *prima facie* case, the burden shifts back to the employer to articulate a legitimate, nondiscriminatory reason for the employee's rejection. *Id.* Once defendant meets this burden of production, not of persuasion, the plaintiff, in order to ultimately prevail, must prove that the reason given by the defendant is merely a pretext for the employer's actions. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253–55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. The burden of persuasion " 'on the ultimate issue of intent remains with the plaintiff at all times.' " *Rossy v. Roche Products, Inc.*, 880 F.2d 621, 624 (1st Cir.1989) (citing *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 889 (1st Cir.1988)).

This particular framework of shifting of burdens is inapplicable in this case, because Cardona presented *direct proof* of both racial and national origin discrimination. *Fields v. Clark University*, 817 F.2d 931, 935 (1st Cir.1987). *See* also *Trans World Airlines Inc., v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985); *Miles v. M.N.C. Corp.*, 750 F.2d F.2d 867, 875 (11th Cir.1985) ("The *McDonnell Douglas* method of proving employment discrimination case, however, pertains to situations where direct evidence of dis-

crimination is lacking."). The shifting burdens of proof is designed to assure that the plaintiff has its day in court despite the unavailability of direct evidence. *Trans World Airlines*, 469 U.S. at 121, 105 S.Ct. at 621–22. *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir.1979) (same analysis is used for age discrimination cases).

■ When plaintiff, as in the present case, has direct evidence of discrimination, the standard for proving that the employment decision would not have taken place in the absence of discrimination, is one of preponderance of the evidence rather than clear and convincing evidence. *Fields v. Clark University*, 817 F.2d 931, 934 (1st Cir.1987). After Cardona presented direct evidence of discrimination, the burden of proof shifted to defendant, who failed to overcome it. *See Trans World Airlines*, 469 U.S. at 121, 105 S.Ct. at 621–22, *Fields*, 817 F.2d at 934–35.

■ Plaintiff Cardona has presented more than sufficient evidence to establish that unlawful discrimination was a motivating factor in the FAA's employment decision to decertify her as an ATA, and ultimately demote her to a clerical position. Since early 1984, plaintiff was the victim of multiple racial and ethnic slurs voiced by her FAA supervisors. This prior discriminatory conduct is probative on the issue of motive and intent to demote. *See Julia Prewitt Brown v. Trustees of Boston University*, 891 F.2d 337, 350 (1st Cir. 1989); *Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1423 (7th Cir. 1986); *Morris v. Washington Metropolitan Area Transit*, 702 F.2d 1037, 1045 (D.C.Cir.1983). Therefore, in determining the question of legitimacy of the employer's motivation in demoting Cardona, previous acts of her employer are relevant. Tucker's biased and uncontradicted comments, which were shared by other key personnel at the FAA, are indicative of defendant's discriminatory attitude. *See Hunter*, 797 F.2d at 1423 (evidence that supervisor called blacks "niggers" was probative to show what supervisor's racial attitudes were).

However, even though plaintiff has established that unlawful discrimination was a motivating factor in the employment decision to demote her, she is not necessarily entitled to relief under 42 U.S.C. § 2000e–16(a). *Fields*, 817 F.2d at 935. The statute, 42 U.S.C. § 2000e–16(d), adopts the provisions of 42 U.S.C. § 2000e–5(f) through (k) and embraces their use in actions such as the one before us now. The law forbids the courts to "require the ... hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended or expelled, or was refused employment or advancement or was suspended or discharged *for any reason other than discrimination.*" 42 U.S.C. § 2000e–5(g) (emphasis added). Therefore, before this Court can order that Cardona be reinstated with back pay, the cause for the decision to demote her must be determined. *Fields*, 817 F.2d at 935, 936–37.

■ The non-discriminatory reasons articulated by the FAA for its personnel actions affecting plaintiff are nothing but a pretext for racial and ethnic discrimination. Furthermore, the Court finds that the evidence presented at trial was sufficient to support a finding that the subjective requirements imposed on Cardona were tailored specifically to inflict emotional distress, so as to justify her demotion. The claims which defendant raised as a business necessity for Cardona's evaluation procedures were frivolous and merely the pretext for discriminatory actions. Moreover, the testimony given by defendant's witnesses in support of their pretextual reasons for plaintiff's demotion did not deserve the Court's credibility. The First Circuit has held that "when a plaintiff has proved by direct evidence that unlawful discrimination was a motivating factor in an employment decision, the burden is on the employer to prove by a preponderance of the evidence that the same decision would have been made absent the discrimination." *Fields*, 817 F.2d at 937. Moreover, plaintiff did not have the burden to prove that her employer did not have a legitimate business reason for the challenged practices. *Johnson v. Uncle Ben's, Inc.*, 657 F.2d 750 (5th Cir.1981), *cert. denied*, 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). The Court concludes that the rationale behind Cardona's demotion was unlawful and there was no justifiable reason for plaintiff's demotion. *Cosby v. U.S.*, 472 F.Supp. 547 (D.Ohio 1979).

■ District courts, sitting as courts of equity, possess wide authority to fashion relief which will eradicate discrimination in the federal government's employment practices. *Mele v. U.S. Department of Justice*, 395 F.Supp. 592 (D.N.J.1975), *aff'd*, 532 F.2d 747 (3rd Cir.1976). Once discrimination in federal employment has been found, the question of whether the victim may receive back pay and retroactive appointment is determined by applying the "but for" test. *Peele v. Califano*, 447 F.Supp. 160 (D.D.C.1978). One option available to the agency in affording relief to a federal employee individually discriminated against is that of awarding back pay and retroactive promotion. *Fisher v. Brennan*, 384 F.Supp. 174 (D.Tenn.1974) *aff'd*, 517 F.2d 1404 (6th Cir.), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 359 (1976).

After examining the uncontested computations Cardona submitted into evidence related to the yearly differences in pay between what she would have earned but for the defendant's discriminatory actions and what she actually earned in the position to which she was wrongfully demoted, the Court finds that plaintiff is entitled to have and recover back pay and allowances in the amount of $25,496.00. This back pay covers the period of time between September 15, 1985 and the day on which the instant cause of action came to be heard. The Court further orders that plaintiff have and recover from defendant the sum of $16.44 per day, which is the difference between her actual salary and that to which she is lawfully entitled in accordance with this Opinion and Order. The aforestated amount of $16.44 per day, shall be paid from December 15, 1989 to the date of plaintiff's reinstatement as ordered by this Court.

Therefore, the Court finds that Cardona is entitled to back pay award in the amount of $25,496.00, plus $16.44 per each day from December 15, 1989 until the date of reinstatement, immediate reinstatement to the position of Air Traffic Assistant at Grade GS–7, Step 6, deletion of the unlawful September 15, 1985 demotion from her personnel records and costs and attorney's fees for these proceedings.

■ The United States is liable for costs and attorney fees the same as a private person. 42 U.S.C. § 2000e–5(k). Therefore, the Court finds that the plaintiff is entitled to costs and attorney's fees for these proceeding. The plaintiff is further entitled to attorney's fees incurred during the administrative proceedings before the FAA and the Equal Employment Opportunity Commission in pursuit of her administrative complaint for discrimination. *Fischer v. Adams*, 572 F.2d 406 (1st Cir. 1978).

Plaintiff is ORDERED to file her bill of costs and attorney's fees on or before February 10, 1990.

Judgment will be entered in favor of plaintiff Milagros B. Cardona in accordance with the terms contained herein.

IT IS SO ORDERED.